Robert H. ARNOLD, Plaintiff Below, Appellant,

v.

SOCIETY FOR SAVINGS BANCORP, INC., a Delaware Corporation, David T. Chase, Sanford Cloud, Jr., Lawrence Connell, Robert E. Green, Jerome H. Grossman, Betsy Henley–Cohn, Ronald D. Jarvis, Edward W. Large, Edward J. Okay, John F. Shea, Jr., Florian A. Stang, Jerry F. Stone, Jr., Bank of Boston Corporation, and BBC Connecticut Holding Corporation, Defendants Below, Appellees.

No. 473, 1993.

Supreme Court of Delaware.

Submitted: Oct. 21, 1994.
Decided: Dec. 28, 1994.

William Prickett, Michael Hanrahan, and Ronald A. Brown, Jr. (argued), Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for appellant.

A. Gilchrist Sparks, III (argued), and Seth D. Rigrodsky, Morris, Nichols, Arsht & Tunnell, Wilmington (Bingham, Dana & Gould, Boston, MA, of counsel), for appellees Bank of Boston Corp. and BBC Connecticut Holding Corp.

Jesse A. Finkelstein, Richards, Layton & Finger, Wilmington (Richard F. Ziegler (argued), Cleary, Gottlieb, Stein & Hamilton, New York City, of counsel), for individual appellees.

Before VEASEY, C.J., and WALSH, HOLLAND, HARTNETT and BERGER, JJ., constituting the Court en Banc.

VEASEY, Chief Justice:

In this appeal from a judgment of the Court of Chancery in favor of defendants we consider the contention of plaintiff below-appellant Robert H. Arnold ("plaintiff") that the trial court erred in granting defendants' summary judgment motion and denying his own. This suit arose out of a merger (the "Merger") of BBC Connecticut Holding Corporation ("BBC"), a wholly-owned Connecticut subsidiary of Bank of Boston Corporation ("BoB"), a Massachusetts corporation, into Society for Savings ("Society"), a wholly-owned Connecticut subsidiary of Society for Savings Bancorp, Incorporated ("Bancorp"), a Delaware corporation. In accordance with the Merger, Bancorp ultimately merged with BoB. Plaintiff was at all relevant times a Bancorp stockholder. Plaintiff named as defendants Bancorp, BoB, BBC, and twelve of fourteen members of Bancorp's board of directors (collectively "defendants").[1]

Plaintiff's central claim is that the trial court erred in holding that certain alleged omissions and misrepresentations in the Merger proxy statement were immaterial and need not have been disclosed. Plaintiff also claims that the Court of Chancery erroneously held that the duties enunciated in *Revlon*[2] and its progeny were not implicated. Also at issue on this appeal is whether or not the individual defendants can be held liable if a disclosure violation is found in view of the exemption from liability provision in Bancorp's certificate of incorporation, adopted pursuant to 8 *Del.C.* § 102(b)(7) ("Section 102(b)(7)"). For the reasons set forth below, we hold that the Court of Chancery erred in failing to find that plaintiff's claim that the partial disclosures in the Merger proxy statement made it materially misleading with re-

spect to one particular fact. In all other respects we find that the trial court committed no reversible error.

We further hold that, in all events, the limitation provision in Bancorp's certificate of incorporation shields the individual defendants from personal liability for the disclosure violation found to exist in this case. Finally, we hold that plaintiff's claim that *Revlon* was implicated under the circumstances of this case is without merit. Therefore, we **REVERSE** in part and **AFFIRM** in part the judgment of the Court of Chancery, and **REMAND** the case to the Court of Chancery for proceedings consistent with this opinion.

## I. NATURE AND STAGE OF PROCEEDINGS

On March 3, 1993, plaintiff sought a preliminary injunction to enjoin consummation of the Merger, scheduled to occur on July 9, 1993. Under the terms of the Merger, Bancorp stockholders would receive 0.80 shares of BoB in exchange for each Bancorp share based on the trading price of BoB shares at closing (subject to an adjustable $20 per share cap). Plaintiff alleged that defendants breached their fiduciary duties of care and candor in the proxy statement dated February 1, 1993 (the "proxy statement") which was sent to stockholders seeking approval of the Merger.[3]

The Court of Chancery denied plaintiff's motion for preliminary injunction, concluding that plaintiff had failed to show a reasonable probability of success on the merits.[4] The trial court did not find any need for corrective disclosures in *Arnold I.* Defendants had filed motions to dismiss and for summary

1. Plaintiff did not name as defendants Rudolph P. Arnold, Esq. (no relation to plaintiff), the Chairman of the board of directors of Bancorp (the "Chairman"), and director Robert Weinerman ("Weinerman"), both of whom abstained from the Merger vote.

2. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173 (1986).

3. In support of his preliminary injunction motion, plaintiff also contended that defendants violated 10 *Del.C.* § 371. Defendants in turn moved to dismiss based on jurisdictional grounds. The

Court of Chancery rejected plaintiff's claim and deferred ruling on defendants' arguments. *Arnold v. Society for Sav. Bancorp, Inc.*, Del.Ch., C.A. No. 12883, *slip op.* at 7–10, 1993 WL 183698 (May 25, 1993) (*"Arnold I"*). The trial court's treatment of these two issues is not before this Court.

4. *Arnold I, slip op.* at 17–18. Plaintiff did not appeal from this decision. The failure to appeal the interlocutory order denying the preliminary injunction does not affect plaintiff's right to prosecute this appeal.

judgment before the ruling on the preliminary injunction. The trial court deferred ruling on these motions at that time. The Merger was effected on July 9, 1993. On that date, plaintiff filed a cross-motion for partial summary judgment. In an opinion and order dated December 15, 1993 (the "Opinion"), the Court of Chancery granted defendants' motion for summary judgment and denied plaintiff's cross motion, holding that defendants did not violate their duty of disclosure.[5] The Court found that the alleged omissions and misrepresentations were immaterial as a matter of law. The Court also rejected plaintiff's *"Revlon* claim." The judgment of dismissal based on the Opinion is the subject of this appeal.

## II. FACTS

The following operative facts govern this litigation. In 1991 Bancorp was suffering from severe financial distress, including an imminent threat of regulatory takeover, due mostly to Society's poor performance. In fact, Bancorp was being kept afloat mainly by the high profitability of Fidelity Acceptance Corporation ("FAC"), a Society subsidiary. Early that year, Bancorp began investigating whether it could "unlock" FAC's value from Bancorp's other poorly-performing assets.

On April 30, 1991, Bancorp publicly announced that it had retained Goldman, Sachs & Company ("Goldman") to identify transactions that would enhance stockholder value. After having canvassed the market for potential acquirors, Goldman informed the Bancorp board of directors (the "board") that there was a paucity of interest in Bancorp. Bancorp then considered selling itself in four parts—Society's deposits, Society's investment and loan assets, FAC, and a "stub" entity.[6] Under this scenario, the sale of each part was contingent upon sale of the others. As part of this effort, Goldman solicited bids for FAC and for Society's deposits, informing

bidders in late 1991 and early 1992 that Bancorp was still available for sale in its entirety. Offers for Bancorp were not forthcoming.

Although FAC was not offered for sale separately, Goldman received nine bids solely for FAC. Eventually, Norwest Corporation ("Norwest") emerged as the highest bidder, with a bid for FAC forecasted to be approximately $275 million as of December 31, 1992.[7]

Norwest's bid for FAC also was conditioned on the securing of all requisite regulatory approvals, among other provisos. Regulatory approval, however, turned out to be problematic. The board engaged several financial advisors to evaluate potential profit-maximizing alternatives, including Goldman, Salomon Brothers Incorporated ("Salomon"), and Merrill, Lynch, Fenner, Smith & Pierce, Incorporated ("Merrill Lynch"), all of whom confirmed the unlikelihood of FAC's sale being effected without selling simultaneously the remaining components of Bancorp.

On May 28, 1992, Goldman presented the following mutually-dependent proposal (the "May Proposal") to the board: BoB would purchase Society's deposits; Norwest would purchase FAC; Goldman itself would purchase much of Society's loan portfolio; and Society's unsalable assets would be relegated to the stub. Goldman advised the board that no such transaction had ever been executed successfully. Also, all three potential purchasers insisted that their purchases be secured by the stub and that sufficient cash be reserved to indemnify them against any asset losses. Given that Society's liabilities exceeded its assets, the reserve cash would have been transferred to the stub from FAC's sale proceeds.

Goldman estimated that stockholders could receive a net value of $15.94 per share, subject to market fluctuations. That value could be increased should a positive value of $3.32 per share for the stub assets materialize. In

5. *Arnold v. Society for Sav. Bancorp., Inc.,* Del. Ch., C.A. No. 12883, 1993 WL 183698 (Dec. 15, 1993).

6. The "stub" consisted primarily of foreclosed real estate properties potentially subject to environmental liabilities.

7. The exact, final figure was subject to market-driven interest rate fluctuations.

that scenario, Goldman estimated a total value of $229.4 million or $19.26 per share. The stub value was very uncertain, however. In fact, Director David T. Chase ("Chase") opined to the board that the stub more likely had a negative value of $3 per share. If that were the case the net value receivable by Bancorp stockholders would amount to approximately $13 per share.[8]

Lawrence Connell ("Connell"), Bancorp's recently-hired Chief Executive Officer, President and board member, recommended that the board pursue the May Proposal, notwithstanding potential associated risks. After deliberations, however, the board rejected the May Proposal, five in favor and eight opposed (5–8),[9] as too risky and speculative. The board thereafter terminated Goldman and issued a press release indicating that Bancorp intended to focus on strengthening itself as an independent entity. Connell was to concentrate on managing Bancorp.[10]

Shortly thereafter, representatives of BoB and Connell discussed a possible acquisition of Bancorp, examining the possibility throughout the summer of 1992. Connell enlisted Goldman's assistance as well as help from Bancorp senior personnel in the negotiations. In June or July, 1992, Connell casually mentioned BoB's interest to the Chairman. Connell did not formally disclose these developments to any board members until BoB sent a written expression of interest on August 24, 1992, which Connell relayed in substance to some board members.

On August 27, 1992, Connell informed the entire board that BoB had conducted due diligence in July and August and was interested in merging with Bancorp. The board discussed the terms of BoB's offer—each

Bancorp share would be exchanged for 0.78 BoB share, with BoB to receive no-shop and lock-up rights. BoB conditioned the offer on quick approval by the board. The board negotiated with BoB over the next three days and, when the board reconvened on August 31, approved the Merger. The final terms were as follows: the exchange ratio was increased in favor of Bancorp stockholders from 0.78 to 0.80, BoB was granted a share cap of $20 and a modified lock-up agreement, and Bancorp obtained a "fiduciary out" provision as part of the no-shop clause. The initial vote was eight in favor, one opposed, with five abstentions (8–1–5). After BoB satisfied the concerns of certain board members,[11] twelve directors voted in favor and two (the Chairman and Weinerman) abstained (12–0–2).[12] Under the terms of the Merger, Bancorp stockholders would receive $17.30 per share as of August 28, 1992.

On February 1, 1993, Bancorp issued the proxy statement, which discussed: the May Proposal; the May 28, 1992, board decision rejecting the May Proposal; the negotiations between Connell and BoB during the summer of 1992; the substance of the August 27 and 31 board meetings (including the final terms approved by the board and the two vote tallies); and the Chairman's and Weinerman's abstentions including their reasons therefor. The proxy statement did not disclose the contingent $275 million bid by Norwest for FAC or Goldman's qualified estimate of $19.26 for Bancorp shares, both of which were generated in connection with the failed May Proposal. On March 4, 1993, Bancorp's stockholders approved the Merger

---

**8.** During a hearing on plaintiff's motion for preliminary injunction, defendants admitted that they had not and could not determine with precision the magnitude of negative value attributable to Bancorp's non-FAC assets.

**9.** Director Florian A. Stang ("Stang") left the meeting before the vote was taken but favored the May Proposal.

**10.** The Chairman, who voted against the May Proposal, equivocated on the question of whether Connell was also authorized to entertain inquiries from potential acquirors.

**11.** BoB agreed to two modifications: first, that BoB would use "best" rather than "reasonable" efforts to obtain regulatory approval; and second, that the $20 per share cap would be adjusted upward in the event the transaction failed to close by June 30, 1993.

**12.** The Chairman and Weinerman later approved the Merger at a March 4, 1993 shareholder meeting.

with 7,750,253 shares in favor,[13] 1,389,272 in opposition, 264,146 abstaining, and 2,552,297 not voting. The Merger was consummated on July 9, 1993.

## III. SCOPE OF APPELLATE REVIEW

Here, the case was decided by the Court of Chancery on cross-motions for summary judgment. A trial court's decision granting summary judgment is subject to de novo review. *Stroud v. Grace*, Del.Supr., 606 A.2d 75, 81 (1992). Our appellate review implicates a determination of whether the record shows that there is no genuine, material issue of fact and the moving party is entitled to judgment as a matter of law. Ch.Civ.R. 56(c); *Fleer Corp. v. Topps Chewing Gum, Inc.*, Del.Supr., 539 A.2d 1060, 1061–62 (1988) (interpreting Ch.Civ.R. 56(c)); *Bershad v. Curtiss–Wright Corp.*, Del.Supr., 535 A.2d 840, 844 (1987).

 In making this determination, if the trial court's factual conclusions "are sufficiently supported by the record and are the product of an orderly and logical deductive process ... we accept them, even though independently we might have reached opposite conclusions." *Levitt v. Bouvier*, Del. Supr., 287 A.2d 671, 673 (1972). Nevertheless, in an appropriate case, this Court may review *de novo* mixed questions of law and fact, such as determinations of materiality, *Zirn v. VLI Corp.*, Del.Supr., 621 A.2d 773, 777 (1993), and in certain cases make its own findings of fact upon the record below, *Shell Petroleum, Inc. v. Smith*, Del.Supr., 606 A.2d 112, 114 (1992). The Court will affirm the trial court's legal rulings unless they represent an "err[or] in formulating or applying legal principles." *Gilbert v. El Paso Co.*, Del.Supr., 575 A.2d 1131, 1142 (1990).

## IV. DISCLOSURE CLAIMS

Plaintiff claims that defendants violated their fiduciary duty of disclosure in four ways. Plaintiff's two material omissions claims are that defendants, though making partial disclosures as to each, omitted (i) Norwest's $275 million bid for FAC and (ii) Goldman's valuation of Bancorp shares at $19.26. The misrepresentation claims relate to (i) the negotiation, approval, and attempted renegotiation of the Merger and (ii) the validity and reliability of management's projections. Additionally, plaintiff argues that BoB is liable as an aider and abettor because it played a significant and substantial role in preparing the allegedly deficient proxy statement.

Defendants respond that each of these categories of facts is immaterial and need not have been disclosed. They further contend that disclosure could actually have misled Bancorp stockholders absent extensive qualifiers in the proxy statement. The Court of Chancery found that the alleged omissions and misrepresentations were immaterial as a matter of law and granted summary judgment to defendants. Opinion at 10–20. As to BoB's liability as an alleged aider and abettor, defendants argue that because the Court of Chancery did not reach this claim, this Court should remand the issue if they are found to have committed disclosure violations.

The genesis of Delaware law regarding disclosure obligations can be traced to the seminal case of *Lynch v. Vickers Energy Corp.*, Del.Supr., 383 A.2d 278 (1978), where, in the context of a self-tender, this Court held that a majority stockholder "owed a fiduciary duty ... which required 'complete candor' in disclosing fully 'all the facts and circumstances surrounding the' tender offer." 383 A.2d at 279 (quoting *Lynch v. Vickers Energy Corp.*, Del.Ch., 351 A.2d 570, 573 (1976)); *accord Shell Petroleum, Inc. v. Smith*, Del.Supr., 606 A.2d 112, 114–15 (1992) (majority stockholder bears burden of showing full disclosure of all facts within its knowledge that are material to stockholder action). A number of subsequent decisions have recognized the existence of fiduciary disclosure obligations. *E.g., In re Tri–Star Pictures, Inc.*, Del.Supr., 634 A.2d 319, 331–32, 334 (1993); *Cede & Co. v. Technicolor,*

---

13. Of this number, the directors, officers, and their affiliates owned 3,405,938 shares as of January 20, 1993, all of which were cast in favor of the Merger. Accordingly, of the votes cast in favor of the Merger, approximately 44 percent were owned by directors, officers, and their affiliates.

*Inc.*, Del.Supr., 634 A.2d 345, 372–73 (1993); *Zirn v. VLI Corp.*, Del.Supr., 621 A.2d 773, 778 (1993); *Stroud v. Grace*, Del.Supr., 606 A.2d 75, 84–88 (1992); *Bershad v. Curtiss–Wright Corp.*, Del.Supr., 535 A.2d 840, 846 (1987); *Rosenblatt v. Getty Oil Co.*, Del. Supr., 493 A.2d 929, 936, 944–45 (1985); *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 889–93 (1985); *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 710–12 (1983).

In *Stroud*, the Court explicated that the disclosure obligation "represents nothing more than the well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." 606 A.2d at 84; *accord Cede*, 634 A.2d at 372–73; *Shell Petroleum*, 606 A.2d at 113 n. 3. The obligation attaches to proxy statements and any other disclosures in contemplation of stockholder action. *Stroud*, 606 A.2d at 85; *Blasius Indus. v. Atlas Corp.*, Del.Ch., 564 A.2d 651, 659 n. 2 (1988). The essential inquiry is whether the alleged omission or misrepresentation is material. *E.g., Stroud*, 606 A.2d at 84.

 Materiality is defined as follows: **An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.** ... It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused a reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, **under all the circumstances,** the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. **Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.**

*TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (emphasis added); *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 944 (1985) (adopting *Northway* standard as law of Delaware); *see also Zirn v. VLI Corp.*, Del.Supr., 621 A.2d 773, 778–79 (1993). Courts should not assess the qualitative importance of a particular disclosure item, *Lynch*, 383 A.2d at 281–82, because the standard requires "full" disclosure of all material facts, *Van Gorkom*, 488 A.2d at 890 (noting that *Lynch's* requirement to disclose "germane" facts means those that are "material"). Further, materiality is to be assessed from the viewpoint of the "reasonable" stockholder, not from a director's subjective perspective. *Zirn*, 621 A.2d at 779.

## V. DISCLOSURE ISSUES IN THIS CASE

The Court of Chancery decided that the contingent FAC bid of $275 million was immaterial as a matter of law "under all the circumstances" because "the sale of FAC was an event that could occur only under certain circumstances (e.g., with regulatory approval, and/or concurrent with the sale of Bancorp)." Opinion at 13–14. Plaintiff challenges this holding on two independent grounds: (i) that the FAC bid was material as a matter of law and had to be disclosed in all events; and (ii) that in view of the partial disclosures in the proxy statement the FAC bid became material and the failure to disclose it was misleading. The Vice Chancellor decided this case on the first ground, but failed to address the second ground.

In our view, however, the case turns on the partial disclosure issue. We hold that the partial disclosures in the proxy statement were misleading in their description of the background information, and that the misleading partial disclosures made the FAC bid material under all the circumstances. Assuming hypothetically that there had been no partial disclosures as set forth and discussed below, the FAC bid may or may not have been material. We need not address that issue because of our holding that the FAC bid was material in view of the partial disclosures. Therefore, we reverse on that ground alone.

We turn now to the partial disclosure-materiality issue. In the instant case, the proxy statement at page 21 reads, in pertinent part:

## Background of and Reasons for the Affiliation; Recommendation of the Bancorp Board of Directors

*Background.* In April of 1991, Bancorp engaged the investment banking firm of Goldman Sachs to aid it in evaluating various possible financial or strategic alternatives intended to maximize stockholder value, which engagement was publicly announced on April 30, 1991. At the time of Goldman Sachs' engagement, the Bancorp Board recognized that the strategic alternatives to be considered might include, but not be limited to, the sale of Bancorp or the sale of Society. During the spring of 1991, Society was in the midst of an examination being conducted by the FDIC and was experiencing asset deterioration. It was also a time when there had been, and continued to be, consolidation in the United States banking and financial services industry.

During the late spring and the summer of 1991, the management of Bancorp, with the assistance of Goldman Sachs, analyzed transactions involving the sale of Bancorp as a whole or the sale of Society or FAC. During the summer and early fall of 1991, management and Goldman Sachs also studied the possibility of a transaction structured as a deposit assumption by a bank or thrift and an asset sale to one or more third parties. **During the summer of 1991, Goldman Sachs, on behalf of Bancorp, solicited indications of interest to acquire Bancorp or Society. By the fall of 1991, these efforts had produced no attractive opportunities for the sale of Bancorp or the sale of Society, at which point there began a more intensive evaluation of a three-part strategy** in which Society's loan and investment assets, its ownership interest in FAC and its retail branch bank system would be sold in separate transactions. After Bancorp's management and Goldman Sachs had investigated such transactions for several months, **which investigation included contacting certain entities previously contacted as well as other parties and evaluating certain potential indications of interest, the Bancorp Board of Directors, at a meeting held on May 28,** 1992, considered whether to pursue a series of transactions in which (a) FAC would be sold to a third party, (b) substantially all of Society's assets would be sold to an affiliate of Goldman Sachs, (c) the remainder of Society's assets (other than cash and its branches) would be placed in a "stub bank" or similar entity and distributed to Bancorp's stockholders and (d) Bancorp (which would then consist of Society's deposits and certain other liabilities, its branches and the cash received from the sale of FAC and the sale of assets) would be merged with a subsidiary of Bank of Boston. In such merger, the holders of Bancorp Common Stock would have received shares of Bank of Boston Common Stock. **The transactions discussed at the May 28, 1992 Bancorp Board meeting were tentative and the Board was advised that, in light of uncertainties involving the value of certain assets, the value ultimately distributable to stockholders could only be estimated. The Bancorp Board was also informed that a number of steps would have to be completed before the transactions could proceed. These steps included the completion of the sale of FAC in an auction process, the completion by the Goldman Sachs affiliate of its due diligence on Society's assets and the negotiation and execution of definitive agreements with all interested parties.**

**In light of a number of factors, including (a) the lack of certainty of the value to be received in the sale of FAC and Society's assets and consequently the value to be received by Bancorp's stockholders,** (b) the substantial costs of proceeding to the stage where more certain values would be ascertainable, (c) the significant risks of failure to close associated with three separate transactions all conditioned upon each other, and the substantial expenses and costs to be incurred in the event of a failure to close and (d) recent improvements in Society's condition and results and Bancorp's prospects, the Board of Directors of Bancorp determined at the conclusion of the May 28, 1992 meeting that it was in the best interests of

Bancorp not to pursue the proposed transactions further and to terminate Goldman Sachs' efforts in connection with exploring strategic alternatives.

(Emphasis added). Plaintiff's partial disclosure arguments stem from the portions of the proxy statement highlighted above.

## A. Norwest's $275 Million Contingent Bid for FAC

██ Materiality requires a careful balancing of the potential benefits of disclosure against the possibility of resultant harm. Even assuming that there was no material issue of fact that the FAC bid was contingent on the sale of other parts of Bancorp, and that regulatory approval for a stand-alone sale of FAC pursuant to the May proposal would not have been forthcoming,[14] the disclosures in the proxy statement were incomplete and therefore misleading under all the circumstances.

One must parse the proxy statement disclosures in light of the essential facts regarding the FAC bid to determine if the disclosures which were made were adequate or incomplete. Set forth below is a parsing of the proxy statement juxtaposed with the findings of the Vice Chancellor concerning the contingent FAC bids.[15] According to the proxy statement:

(1) In 1991 Goldman, on behalf of Bancorp, "solicited indications of interest to acquire Bancorp or Society."

(2) By the fall of that year "these efforts had produced no attractive opportunities for the sale of Bancorp or the sale of Society."

(3) At that point "there began a more intensive evaluation of a three-part strategy in which Society's loan and investment assets, its ownership interest in FAC and its retail branch bank system would be sold in separate transactions."

(4) Bancorp and Goldman investigated "such transactions for several months."

(5) This "investigation included contacting certain entities ... and evaluating certain potential indications of interest."

[The Vice Chancellor found, with regard to this "investigation" and these "potential indications of interest," that:

[S]everal companies submitted bids for FAC, one of which was valued at approximately $275 million. The bids were indeed submitted and were genuine offers to purchase FAC. However, these circumstances do not mean that FAC could be or was intended to be sold, in a stand-alone transaction, to the highest bidder. On the contrary ... the FAC bids were solicited as one part of the proposed Goldman transaction ... [I]f any part of [the May Proposal] was contingent or speculative in any way, the sale of FAC must have been contingent, too ... [T]he sale of FAC was not an event that could occur under any scenario ... the sale of FAC ... could occur only under certain circumstances (*e.g.,* with regulatory approval, and/or concurrent with the sale of Bancorp).

Opinion at 13–14.]

(6) Thereafter the Bancorp board met on May 28, 1992, and "considered whether to pursue a series of transactions in which (a) FAC would be sold to a third party, (b) substantially all of Society's assets would be sold to ... Goldman ... (c) [the stub assets would be] distributed to Bancorp's stockholders and (d) Bancorp ... would be merged with a subsidiary of Bank of Boston."

(7) The transactions discussed at this meeting "were tentative and the board was advised that, in light of uncertainties involving the value of certain assets, the

---

**14.** There may have been, theoretically, a material issue of fact on the issue of the unlikelihood of regulatory approval. But we need not decide that question because plaintiff has not predicated his appeal on that ground, and because we have assumed, solely for purposes of this analysis, that regulatory approval would not have been forthcoming. *See infra* note 19.

**15.** The relevant proxy statement material is set forth in numbered paragraphs in regular type. The findings of the Vice Chancellor are bracketed and in bold type.

value ultimately distributable to stockholders could only be estimated."

(8) The board was also informed at the May 28, 1992 meeting "that a number of steps would have to be completed before the transactions could proceed."

[The Vice Chancellor further found that "as contemplated by Goldman Sachs, the solicitor of the FAC bids, the sale of FAC was but one component in a complicated transaction." Opinion at 14.]

(9) "These steps included the completion of the sale of FAC in an auction process."

[In an earlier part of the Opinion the Vice Chancellor had found:

In order to quantify its strategy, Goldman Sachs sought to value the FAC component of the Proposed Transaction. It accomplished this by conducting an auction of FAC.

Nine companies submitted "serious" preliminary bids for FAC; Norwest submitted a high bid of $275 million. Goldman Sachs invited the five highest bidders to conduct due diligence of FAC, and after Norwest's completion of due diligence, it confirmed its offer to buy FAC for $275 million. In May 1992, contracts for the sale of FAC were drafted; the only steps remaining were for Bancorp and its shareholders to approve the Proposed Goldman Transaction and the parties to the sale to sign the agreements.

Opinion at 2.]

(10) "In light of a number of factors, including (a) the lack of certainty of the value to be received in the sale of FAC and Society's assets and consequently the value to be received by Bancorp's stockholders" and costs, risks of failure to close and recent improvements in Society's condition and Bancorp's prospects, the board determined not to pursue the proposed transactions further.

[The Vice Chancellor further found:

[T]he bids submitted for FAC were highly speculative and contingent. As a result, they in no way established a value of Bancorp.... [T]hey were bids for FAC, not Bancorp. No reasonable shareholder could extrapolate the value of a parent company from the value of one of its subsidiaries. The shareholder would have no way of knowing if other subsidiaries ... had a negative value and the extent of the negative value, if any.

Opinion at 15.]

The problem with the Vice Chancellor's conclusion that the FAC bid was not material is that the partial and elliptical disclosures in the proxy materials were misleading without a disclosure of the $275 million bid and an explanation of its contingent nature. The Vice Chancellor's own findings reveal the incompleteness of the disclosures in the proxy statement and how the contingent FAC bids could have been described without inundating the stockholders with information and without "an overemphasis of the FAC bids." Opinion at 14.

■ We hold only that, once defendants traveled down the road of partial disclosure of the history leading up to the Merger and used the vague language described, they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events. Cf. Lynch, 383 A.2d at 281 (holding that defendants violated their disclosure obligations when they partially disclosed a reliable, "floor" asset valuation but did not disclose an equally reliable "ceiling" value).[16] We agree with the Vice Chancellor that, as an abstraction, Delaware law does not require disclosure of inherently unreliable or speculative information which would tend to confuse stockholders or inundate them with an overload of information. This principle is consistent with Bershad v. Curtiss-Wright Corp., Del.Supr., 535 A.2d 840, 847 (1987) ("Efforts by public corporations to arrange mergers are immaterial under the Rosenblatt v. Getty standard, as a matter of law, until the firms have agreed on

16. Cf. Freedman v. Restaurant Assocs., Del.Ch., C.A. No. 9212, slip op. at 19, Allen, C., 1990 WL 135923 (Sept. 21, 1990) reprinted in 16 DEL. J.CORP.L. 1462, 1476 (1991) ("Although management may have no general obligation to disclose its purposes or motivation, once it undertook to disclose its purpose in revising the offer, it had an obligation to do so truthfully and candidly.").

the price and structure and the transaction.").[17] But, under the circumstances of this case—which involve a partial and incomplete disclosure of historical information—we disagree with the Vice Chancellor's holding that the existence of the $275 million bid for FAC was not material.[18]

To be sure, the bid for FAC was contingent since it was only one part of an interdependent series of transactions and apparently required regulatory approval.[19] It does not follow from this fact, however, that a reasonable stockholder, having been partially informed of the history in the language of the proxy statement, would not have found it significant that one subsidiary of Bancorp had been the subject of a genuine auction bid of $275 million under contingent and explain-

able circumstances when the Merger transaction itself was valued at $200 million, some 37 percent less than Norwest's contingent bid for FAC. We find that there is a substantial likelihood that the disclosure of this information would have significantly altered the "total mix" of information in the view of a reasonable stockholder. The voting choice of a stockholder included the decision of whether it was better to remain a stockholder in a continuing Bancorp with FAC as an asset (though there are other components with negative value and it may not be viable to sell FAC alone) or to be transformed into a stockholder in a new entity with Bancorp's asset/liability mix plus other assets and liabilities combined as part of the surviving entity.[20] Without this information, the reason-

17. Cf. *Kahn v. Household Acquisition Corp.*, Del. Supr., 591 A.2d 166, 171 (1991) (not requiring supplemental disclosure of a pending, governmental subsidy to corporation); *Weinberger v. Rio Grande Indus.*, Del.Ch., 519 A.2d 116, 1290–30 (1986) (not requiring disclosure of overly speculative earnings projections). *But cf. Basic Inc. v. Levinson*, 485 U.S. 224, 232–37, 108 S.Ct. 978, 983–86, 99 L.Ed.2d 194 (1988) (rejecting bright line rule adopted in *Bershad*).

18. The Court notes that it is not appropriate to decide whether or not, if there had been no partial disclosures, a reasonable stockholder would consider it important to know the facts regarding a sale of a corporate asset that could not be effected under any of the circumstances as they existed at the time of disclosure. *See SEC v. Texas Gulf Sulphur Co.*, 2d Cir., 401 F.2d 833, 849 (1968) (en banc) ("whether facts are material ... will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity"), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *see also In re Anderson, Clayton Shareholders' Litig.*, Del.Ch., 519 A.2d 680, 691–93 (1986) (finding success on merits of disclosure claim unlikely on preliminary injunction; rejecting argument that asset appraisal was material because the valuation was irrelevant to the recapitalization transaction at hand); *Lewis v. Charan Indus.*, Del.Ch., C.A. No. 7738, *slip op.* at 6–7, Berger, V.C., 1984 WL 8257 (Sept. 20, 1984) *reprinted in* 10 DEL.J.CORP.L. 233, 238 (1985) (same; finding unpersuasive an argument that asset appraisal was material because the valuation was based on an irrelevant liquidation scenario and was rejected by investment advisor).

19. The record is somewhat inconsistent regarding whether regulatory approval of FAC's stand-alone sale was merely unlikely or impossible.

Milton R. Berlinski ("Berlinski"), a Goldman Vice President, stated in his affidavit that "a sale of FAC independently of the rest of Society was *not possible*." Connell in his affidavit stated that "selling FAC ... was simply *not* a viable option." Chase in his deposition stated that "[FAC] could not be sold by itself." A document promulgated by Salomon titled "Regional Overview," however, states that "[i]t is highly unlikely that proceeds from the sale of FAC could be realized ... due to regulatory constraints." A document Merrill Lynch produced, titled "Capital Alternatives," states that "it is questionable whether regulators would give approval of the dividend or even sale of FAC." Plaintiff's expert, Professor Donald J. Puglisi ("Professor Puglisi"), in an affidavit submitted on plaintiff's behalf, stated in conclusory terms: "There is no basis for arguing that FAC could not be sold. Indeed, the Goldman Sachs auction bids were premised on the assumption that FAC could, indeed, be sold." We need not decide whether there was a material issue of fact relating to the regulatory approval proposition because plaintiff does not rely in his argument on such a finding. Further, for purposes of our analysis of the partial disclosure issue, we have predicated our holding on the assumption most favorable to the defendants— namely that it is undisputed that the FAC bid was contingent and interdependent on the sale of the other parts of Bancorp, and that regulatory approval of a stand-alone sale of FAC would not have been forthcoming.

20. As for the actual value of FAC, because the Merger was an exchange of stock transaction, post-Merger BoB stockholders (such as plaintiff) theoretically stand to reap the benefits of FAC's profitability in the future. That is, in merging with Bancorp, BoB absorbed the value of FAC. Thus, FAC's net profit would be reflected in the value of shares held by post-Merger BoB stockholders. This Court has earlier held that stock-

able stockholder could infer from language in the proxy statement that there only was an "evaluation," an "investigation," "certain potential indications of interest," and that there were no "genuine" bids for actual dollar amounts in an "auction." Thus, the Court of Chancery erred as to the partial disclosure claim, in granting defendants' motion for summary judgment, and denying plaintiff's cross-motion for partial summary judgment.[21]

We have concluded that the partial disclosure issue should be decided on the summary judgment record. For purposes of our decision, predicated as it is on the partial disclosure ground, the record is complete and this Court is in as good a position as the Court of Chancery to decide this mixed question of law and fact.

We decide only the case before us. *See QVC*, 637 A.2d at 51. Therefore, it is important to understand what we are not deciding. First, we are not deciding that the FAC bid was material as a matter of law. Second, since we have predicated our decision narrowly on the partial disclosure ground and assumed the facts in the light most favorable to the defendants on the regulatory approval question,[22] the material issue of fact analysis on that question is moot.

### B. Goldman's Valuation of Bancorp at $19.26 Per Share

█ Plaintiff argues that Goldman's valuation of Bancorp at $19.26 per share in the Executive Summary of the May Proposal was material in light of the value of those shares under the Merger—$17.30 as of August 28, 1992.[23] Defendants counter that Goldman never fixed Bancorp's share value at $19.26 because the May Proposal explicitly, inextricably bound that figure to a number of speculative contingencies, such as the uncertain value of the stub. The Court of Chancery held that exclusion of the $19.26 figure was proper because it was not material. We agree.

█ Goldman's share valuation was too unreliable to be material. A board of directors must balance potential benefit versus harm when deciding whether or not to disclose an investment advisor's earnings per share valuation. *In re Vitalink Communications Corp. Shareholders' Litig.*, Del.Ch., C.A. No. 12085, *slip op.* at 28, Chandler, V.C., 1991 WL 238816 (Nov. 8, 1991) *reprinted in* 17 DEL.J.CORP.L. 1311, 1335 (1992). In opining that an offer is fair, where an investment advisor promulgates a "best case" projection predicated on an interplay of several, uncertain variables, the forecasted value need not be disclosed because it is too speculative and thus immaterial. *Weinberger v. Rio Grande Indus.*, Del.Ch., 519 A.2d 116, 129–30 (1986) (earnings projection immaterial even though it depicted outlook more optimistic than that underlying the offer). Disclosing an overly optimistic per share figure may be harmful because it might induce

holders in certain situations are entitled to a control premium in a merger context where consummation of the proposed merger would effectively eliminate any expectation of such a premium in the future. *Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr., 637 A.2d 34, 42–43 (1994). The facts of this case did not entitle plaintiff to such a premium. *See infra* part VII (discussing plaintiff's "*Revlon* claim"). To the extent that plaintiff's concern is that he will not realize profits stemming from FAC's operations, as a post-Merger BoB stockholder, plaintiff has not lost such an opportunity. Nonetheless, the failure to disclose the FAC bid under these circumstances deprived plaintiff of the information necessary to make an informed choice of whether or not to support the Merger (which would place FAC as an asset in the merged entity) or to vote against the Merger and keep FAC as part of an independent Bancorp. Plaintiff was entitled to this choice whether or not the

control premium is still available in the merged enterprise.

**21.** As we note *infra* in part VIII, we leave to the Court of Chancery upon remand the question of whether plaintiff is entitled to a remedy under the circumstances of this case, and, if so, the nature of that remedy. Further, because of our holding regarding this claim, the Court also remands to the trial court plaintiff's derivative aiding and abetting claim against BoB.

**22.** *See supra* notes 14, 19.

**23.** The Court notes that it is unclear why plaintiff focuses on the value of Bancorp shares as of August 28, 1992, rather than the date on which Bancorp issued the proxy statement, February 1, 1993. The Court's analysis *infra* is not dependent on which date is more appropriate, however.

stockholders to hold out for an elusive, higher bid. This risk cannot be reduced significantly by attempting to qualify the figure. *Vitalink, slip op.* at 29, 17 Del.J.Corp.L. at 1335–36. In fact, disclosure of an unreliable share valuation can, under some circumstances, constitute material misrepresentation. *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 891 (1985).

In the instant case, plaintiff argues that the $19.26 figure found in the "Estimated Values" section of the Executive Summary, which Goldman used to describe the May Proposal to the board, was fixed. The record refutes plaintiff's claim. First, footnote (c) in the "Estimated Values" section qualifies the "Stub Security" value. It states that the "stub requires some cash to satisfy indemnity. Amount of cash is subject to negotiations with various buyers." Second, in the section in the Executive Summary titled "Issues to Consider Regarding Valuation Changes," two concerns are indicative of the uncertainty attached to the $19.26 valuation: (i) if there is a "[m]aterial deterioration of loan portfolio's credit quality, existence of environmental issues, [or] inability to obtain clear title," there would be no positive effect and the following negative effect—"Assets will be transferred to stub reducing cash value to stockholders. Deterioration may impair deal economics"; and (ii) if the "[l]oan does not meet secondary market documentation standards," there again would be no positive effect and the following negative effect—"Legal restrictions in loan documents or servicing agreements may prohibit sale or transfer of loans. Failure to meet standards will increase assets in the stub entity, reducing cash value to shareholders."

Additionally, defendants submitted several affidavits and deposition testimony confirming the unreliability of the stub's estimated value, which in turn made the $19.26 figure unreliable. Connell in his affidavit stated in relevant part:

> [T]here was a fourth element to the May Proposal. Society had and still has substantial assets which are essentially unsalable, generally comprised of foreclosed commercial real estate which, in many cases, have a negative value due to environmental or·other problems.... The necessity for this stub entity created further complexity and made it difficult, if not impossible, to value accurately the entire transaction. Although Goldman indicated that the value of the stub might be as high as $3.32 per share ... Goldman made it clear to Board that that value was based on the book value of the stub assets, which is not reflective of the amount of their market or liquidation value. Stated differently, no buyer would purchase such assets at book value at that time.

In pertinent part, Berlinski in his affidavit stated:

> The Board ... determined not to proceed further with [the May Proposal] since it viewed it as too speculative, complex and difficult to value.... [T]he values it would achieve were uncertain, in part due to the inability to assess the likely trading value of the stock in the "stub entity" that would hold the Bank's unsalable assets, such as its foreclosed real estate. We told the Board that the $3.32 per share value we attributed to the stub was simply its estimated book value and that stock in the stub was likely to trade for considerably less.

In the relevant portion of Stone's affidavit, he stated:

> [W]hile I believed [in May 1992 that] it was worth at least pursuing the [May Proposal] further, I certainly did not believe, and to the best of my knowledge, no one else on the Board believed that that proposal—even if it could be successfully concluded—would be worth as much as $19.26. This was in part because the existence of the "stub security" (representing ownership of generally unsalable assets) made it difficult if not impossible to know what the actual value of the proposal would be and the need to set aside cash in the stub to indemnify purchasers of Society's assets created further uncertainty as to that value. Although Goldman indicated in its presentation to the Board that the stub could have a book value of $3.32 per share, Goldman made it clear to the Board both in its written presentation and orally that this value was speculative and by no means

represented the value at which the stub security would trade in the market.

In his deposition testimony, Chase stated: What Goldman has done in this executive summary ... is offer a projection ... which may or may not have materialized[.] ... [The Executive Summary] does. talk about the stub security as it describes $3.32 as a value [*sic*], and that was one that I just described prior to looking at this, that would have been like a $3.00 minus rather than $3.00 plus. Take $3.00 off the 15.94 which is the per share basic bid and [that] would have dropped the bottom line from $19.26 to like maybe $12 and change, and that's why I didn't like [the May Proposal] at all.[24]

Defendants' submissions shifted the burden to plaintiff to counter their claim that the stub had some value less than the estimated $3.32 per share. *See* Ch.Civ.R. 56(e); *Irwin & Leighton, Inc. v. W.M. Anderson*, Del.Ch., 532 A.2d 983, 986 (1987); *Tanzer v. International Gen. Indus.*, Del.Ch., 402 A.2d 382, 385 (1979). Rather than make any such offer of proof, plaintiff elected to argue in the alternative without ever having made an affirmative case that the $3.32 figure reflected a realizable value.[25] Accordingly, plaintiff failed to meet his counter-burden. *See* Ch. Civ.R. 56(e); *Irwin & Leighton*, 532 A.2d at 986; *Tanzer*, 402 A.2d at 385.[26]

Unlike the elliptical disclosure of facts surrounding Norwest's $275 million bid for FAC, discussed *supra*, defendants made a simple, accurate disclosure in the proxy statement relating to the value of Bancorp shares under the May Proposal: "[T]he Board was advised that, in light of uncertainties involving the value of negative assets, the value ultimately distributable to stockholders could only be estimated." Given that the finding of the Court of Chancery as to the unreliability of the $19.26 figure is supported by the record, the statement above was neither misleading nor incomplete. Thus, the trial court did not err in holding

**24.** Plaintiff claims that the Court of Chancery erred in factoring in Chase's concern because a director's subjective concerns are not cognizable under the objective materiality test. *See Zirn v. VLI Corp.*, Del.Supr., 621 A.2d 773, 779 (1993). Even disregarding Chase's concerns as to the unreliability of the $19.26 figure, the Executive Summary and defendants' other submissions consistently attest that the value was a mere estimate predicated on many uncertainties. Furthermore, the Court of Chancery does not appear to have relied on Chase's subjective opinion to conclude that the figure was immaterial. Rather, the trial court used Chase's skepticism as one basis among many for its finding that the $19.26 per share figure was unreliable. In any event, this Court's conclusion is not dependent on Chase's opinion.

**25.** Plaintiff's argument begins with the phrase: "Even assuming, as the directors claim, Society had some undeterminable negative value...." Professor Puglisi, in a supplementary affidavit submitted on plaintiff's behalf, stated: "While I agree that a *precise* fair value cannot be assigned to Bancorp's components from reference to its Form 10-K, I am of the strong view that a reasonable estimate of such value can be derived therefrom." This statement was made in the context of his discussion of the fairness of the Merger's exchange ratio. The Court finds that this is not sufficient to create a genuine issue of material fact regarding whether the $3.32 figure attributed to the stub reflected an attainable value. *See* Ch.Civ.R. 56(e).

**26.** The Court notes that defendants' submissions are internally inconsistent with regard to the extent that the stub's value was less than the estimated $3.32 per share, but this inconsistency is not determinative. Chase stated that the stub had a negative value of $3 per share whereas Connell and Berlinski stated only that the value was less than $3.32, without speculating as to the exact discrepancy between the estimated and actual value. Though this variance in opinions relating to the stub's actual value created a factual dispute, the dispute was not material in this case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (only disputes regarding material facts can preclude summary judgment under Federal Rule of Civil Procedure 56; which facts are material depend on the specific facts and substantive law in individual cases); *Burkhart v. Davies*, Del.Supr., 602 A.2d 56, 59 (1991) (noting persuasiveness of *Anderson* in Delaware summary judgment analysis), *cert. denied,* — U.S. ——, 112 S.Ct. 1946, 118 L.Ed.2d 551 (1992). The fact that the stub's actual value was less than the $3.32 figure was relevant only to demonstrate that the $19.26 value was not reliable, not to show that some other figure more accurately reflected Bancorp's true value. Thus, regardless of the extent to which the stub's actual value was less than $3.32, the fact that it was less is the only material summary judgment fact. This latter factual assertion was uncontroverted and thus must be accepted as true. *See Tanzer*, 402 A.2d at 385; *Plant v. Catalytic Constr. Co.*, Del.Super. 287 A.2d 682, 684, *aff'd,* Del.Supr., 297 A.2d 37 (1972).

the $19.26 estimate immaterial as a matter of law. *E.g., Vitalink, slip op.* at 28–29, 17 DEL.J.CORP.L. at 1335–36; *Rio Grande,* 519 A.2d at 129–30.

## C. The Merger Negotiations

Plaintiff raises four misrepresentation arguments relating to the disclosure of merger negotiations in the proxy statement: that the statement (i) disclosed that the board had negotiated the Merger when in fact Connell "negotiated" the Merger during the summer of 1992 without board approval, himself arriving at the $20 figure for the share cap; (ii) should have disclosed more emphatically Weinerman's and the Chairman's abstentions; (iii) should not have described the final Merger vote as "unanimous" when in fact the vote purportedly was eight in favor, one in opposition, and five abstaining (8–1–5); and (iv) should have been supplemented with disclosure of the board's post-approval "renegotiation" meetings with BoB. The Court of Chancery held that these purported "facts" were immaterial. We agree.

 Plaintiff's misrepresentation claims lack merit. His claim that Connell first suggested the $20 share cap figure, which was not the exchange value as of the date the board approved the Merger, does not satisfy the materiality test under the circumstances of this case. *See Cede & Co. v. Technicolor, Inc.,* Del.Supr., 634 A.2d 345, 372 (1993) (affirming trial court's finding that there was no need to disclose a share value which a target director initially deemed acceptable, without consulting investment advisors, because "non-disclosure [of such was] plainly not material"). *But cf. Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 890–92 (1985) (finding violation of disclosure obligations where proxy statement partially disclosed that target director first suggested final, agreed-upon merger share price but failed to describe accurately the motive be-

hind focusing on that figure). Given that the proxy statement described Weinerman's and the Chairman's abstentions and their respective reasons therefor in great detail,[27] plaintiff's second argument is without merit.

 The third and fourth arguments simply mischaracterize the facts. With regard to the third argument, the 8–1–5 vote was an interim one which was disclosed; the final vote, which also was disclosed, was twelve in favor with two abstentions. Further, the description of the 12–0–2 vote— "unanimous[ ] ... (with two directors abstaining)"—was proper. *See Weinberger v. UOP, Inc.,* Del.Ch., 426 A.2d 1333, 1353 (1981), *rev'd on other grounds,* Del.Supr., 457 A.2d 701 (1983). As to plaintiff's final argument, the board's discussion with BoB did not involve a "renegotiation" of the Merger. The primary purpose of the meeting was to ensure compliance with the terms and conditions of the original, approved Merger—more specifically, that the closing of the Merger be timely. Such subsequent, purely implemental meetings are immaterial under the circumstances of this case. *See Bershad v. Curtiss-Wright Corp.,* Del.Supr., 535 A.2d 840, 847 (1987) (holding that there is no requirement under *Rosenblatt* of "play-by-play" disclosure of merger negotiations because such details would not alter the "total mix" of information provided stockholders and thus are immaterial). Thus, the Court of Chancery did not err in rejecting plaintiff's claims relating to the Merger negotiations.

## D. The Board's Disavowal of the Reliability of the Management Projections

 Plaintiff argues that the proxy statement misled stockholders by disclosing that the board did not rely on Goldman's earnings projections, prepared in connection with the May Proposal, when in fact the board relied

---

**27.** The relevant paragraph in the Proxy Statement reads:

[The Chairman] and Mr. Weinerman abstained from the Board's recommendation and determination. [The Chairman] stated that, while the [Merger] might be a good transaction for stockholders, he could not vote at that time to recommend it because he believed he would

benefit from a lengthier period to review the transaction and he felt it was difficult to assess whether further attempts to find alternative acquirors might have resulted in the receipt of more attractive offers. Mr. Weinerman believed that he would benefit from a lengthier period to review Bank of Boston's financial condition and business.

on such projections in evaluating the fairness of the Merger. In support, Plaintiff relies on a memorandum dated May 26, 1992, from Connell to the board (the "Connell memo") regarding "Project Elite" (the May Proposal). The Court of Chancery rejected plaintiff's claim as factually unsupported.

Plaintiff's claim is without merit. In relevant part, the proxy statement reads:

(With respect to Bancorp's prospects, the Board of Directors took into account, among other things, management's base case projections (prepared in April, 1992 in conjunction with Bancorp's capital plan for regulatory purposes) (the "base case") and certain alternative projections prepared by management under more favorable assumptions (the "best case"). The projected 1994 earnings per share ("EPS") under the base case and best case were $1.79 and $2.75, respectively, which reflected numerous assumptions [listing assumptions]. It should be noted that many of the assumptions, including those referenced above, were outside the control of Bancorp, and neither Bancorp nor any other person or entity makes any representation as to their achievability [*sic*]; such projections have not been updated and Bancorp does not assume hereby any obligation to update them. **Accordingly, neither Bancorp nor any other person or entity believes that Bancorp stockholders should rely on such projections.**)

(Emphasis added). The crux of plaintiff's argument is that the board (or at least management) relied on the "best case" projections in evaluating the fairness of the Merg-

er. The Connell memo, however, does not rely on the "best case" scenario. Rather, it concludes that, because the risks associated with achieving the "best case" scenario outweigh the potential benefits, the board should reject the "best case" projection and instead pursue the May Proposal.[28] Nothing in the challenged, above-highlighted portion of the proxy statement was inaccurate or misleading.[29]

## VI. SECTION 102(b)(7) PROTECTION

Plaintiff argues that the exemption from liability in Bancorp's certificate of incorporation, adopted pursuant to Section 102(b)(7), does not extend to disclosure claims, and that, even if the provision so extended, the individual defendants' conduct here falls within two exceptions. Plaintiff further contends that his claims against Connell for disclosure violations in his capacity as an officer (rather than a director) would still survive. Finally, plaintiff argues that the individual defendants waived their Section 102(b)(7) protection in the Court of Chancery. The Court of Chancery did not reach the Section 102(b)(7) issue. In view of our finding that there was a disclosure violation, we are required to reach these questions. We hold that Section 102(b)(7), as adopted by Bancorp, shields the individual defendants from liability, and that the shield was not waived.

### A. Application of Section 102(b)(7) to Disclosure Claims

 Article XIII of Bancorp's certificate of incorporation, which parallels the lan-

---

**28.** The Connell memo states in relevant part:

While management firmly believes it can accomplish projections in its best case scenario and is willing and fully committed to do so, given the projected value presented by Goldman Sachs & Co. of $15.50 per share in a tax free exchange of stock, a stub with an estimated additional stated value of $3.50 [the stub value is highly uncertain due to various encumbrances and liquidation uncertainties], plus a profit participation, management believes the risks associated with achieving the best case results outweigh the potential of actually attaining those results and attaining those results [*sic*] and accordingly believes it would be in the best interests of the Company

to proceed with the project [the May Proposal].
(Emphasis added).

**29.** The Court of Chancery found that Connell's statement in the memo was made in support of the Merger. Opinion at 19. This finding is clearly erroneous because Connell made the statement in support of the May Proposal, not the Merger. The trial court's confusion may stem from defendants having assigned the name "Project Elite" to both the May Proposal and the Merger. Though the findings of the Court of Chancery appear somewhat flawed in this minor respect, it properly held that defendants did not breach their disclosure obligations with respect to the management projections.

guage in Section 102(b)(7), states in relevant part:

No director of the Corporation shall be liable to the Corporation or its stockholders for monetary damages **for breach of fiduciary duty** as a director, except for liability: (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law ...

(Emphasis added). Plaintiff claims that the legislative history of Section 102(b)(7) supports his argument that the shield is not applicable here. Plaintiff's argument, however, bypasses a logical step in statutory analysis.[30] A court should not resort to legislative history in interpreting a statute where statutory language provides unambiguously an answer to the question at hand. *E.g., Grand Ventures, Inc. v. Whaley,* Del.Supr., 632 A.2d 63, 68 (1993) ("In the absence of any ambiguity, the language of the statute must be viewed as conclusive of the legislative intent.... The judicial role is then limited to an application of the literal meaning of the words[ ]") (internal citation omitted); *Hudson Farms, Inc. v. McGrellis,* Del.Supr., 620 A.2d 215, 217 (1993) ("If there is no reasonable doubt as to the meaning of the words used, the statute is unambiguous and the Court's role is limited to an application of the literal meaning of the words[ ]"); *Silverbrook Cemetery Co. v. Department of Fin.,* Del. Supr., 449 A.2d 241, 242 (1982) (holding that

trial court erred by engaging in statutory interpretation where interplay of two provisions yielded clear and unambiguous result).[31]

In the instant case, plaintiff's claim that Section 102(b)(7) does not extend to disclosure violations must be rejected as contrary to the express, unambiguous language of that provision. Section 102(b)(7) provides protection "for breach of fiduciary duty." Given that the fiduciary disclosure requirements were well-established when Section 102(b)(7) was enacted and were nonetheless not excepted expressly from coverage, *see Hudson Farms,* 620 A.2d at 218 ("it is presumed that the General Assembly is aware of existing law when it acts"), there is no reason to go beyond the text of the statute, *see, e.g., Grand Ventures,* 632 A.2d at 68; *Hudson Farms,* 620 A.2d at 217. Thus, claims alleging disclosure violations that do not otherwise fall within any exception are protected by Section 102(b)(7) and any certificate of incorporation provision (such as Article XIII) adopted pursuant thereto. In any event, nothing in the legislative history of the adoption of Section 102(b)(7) is inconsistent with the result we reach herein.

## B. Applicability of the Exceptions to Section 102(b)(7)

 Plaintiff argues that the individual defendants' conduct implicates the duty of loyalty and the proscription against knowing, intentional violations of law.[32] He argues

---

**30.** Statutory interpretation involves a purely legal determination, *see Hercules Inc. v. Leu Trust & Banking,* Del.Supr., 611 A.2d 476, 481 (1992), *cert. dismissed,* —— U.S. ——, 113 S.Ct. 1836, 123 L.Ed.2d 463 (1993), and thus review is de novo, *Cede & Co. v. Technicolor, Inc.,* Del.Supr., 634 A.2d 345, 360 (1993).

**31.** *See also Burlington N.R.R. Co. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 461, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987) ("Unless exceptional circumstances dictate otherwise, '[w]hen [a court] find[s] the terms of a statute unambiguous, judicial inquiry is complete[ ]'") (citation omitted); *Uniform Stat. & Rule Constr. Act* § 19 (Proposed Official Draft June 10, 1994) ("The text of a statute or rule is the primary, essential source of its meaning[ ]"); *id.* § 18 cmts. ("The starting point is always the text; an examination of it and its context may yield a construction that is cer-

tain. If so, that ends the inquiry[ ]"); 2A *Sutherland Stat. Constr.* § 48.01, at 302 ("extrinsic aids [such as legislative history] may [generally] be considered only when a statute is ambiguous and unclear"). Further; where the statute expressly enumerates specific exceptions, courts should not imply or create new exceptions from otherwise generally-applicable language, *id.* § 47.11, at 165, unless failure to do so would lead to a "manifest contradiction of the apparent purpose of [the] statute," *id.* at 50 (Supp.1994).

**32.** *See Zirn v. VLI Corp.,* Del.Supr., 621 A.2d 773, 778 (1993) ("The requirement that a director disclose to shareholders all material facts bearing upon a merger vote arises under the duties of care and loyalty[ ]"); *see also* Bradford D. Bimson, Comment, *Zirn v. VLI Corp.: The Far-Reaching Implications of Loquacity,* 19 Del. J.Corp.L. 1067, 1116 (1994) (arguing that it

that the individual defendants' conduct falls within the exceptions in Section 102(b)(7)(i) & (ii) because they: (i) "improperly interfer[ed] with the voting process by knowingly or deliberately failing to make proper disclosure"; (ii) acted in bad faith and recklessly; and (iii) improperly granted no-shop and lock-up clauses as part of the Merger.[33] Plaintiff also contends that Connell and Stang were interested directors who violated their duty of loyalty and that Connell's actions in his role as an officer fall outside Section 102(b)(7)'s protection.

The individual defendants counter that plaintiff's claims are essentially conclusory for there is no affirmative proof that they knowingly or deliberately failed to disclose facts they knew were material. That is, they argue that they balanced in good faith which facts to disclose against those to withhold as immaterial. Next, they assert that case law does not support plaintiff's claim relating to the no-shop and lock-up clauses under the facts of this case. Finally, the individual defendants contend that the claim relating to Connell's conduct as an officer is barred pursuant to Supreme Court Rule 8 because it was not raised in the Court of Chancery.[34] On the merits, they assert that plaintiff has failed to segregate any of Connell's actions as an officer that fall within the exceptions to Section 102(b)(7).

Plaintiff's claims are not supported by the record or Delaware law. The individual defendants did not violate the duty of loyalty under the facts of this case.[35] Plaintiff's intentional violation argument is unsupported by the record.[36] As to plaintiff's third claim, though the granting of no-shop and lock-up rights can under certain circumstances implicate the duty of loyalty, without any additional, supportive factual basis for his claim, sufficient at least to create a genuine issue of material fact, plaintiff's reliance on *Mills* and *Unocal* is unpersuasive. Even assuming that plaintiff's final argument is not procedurally barred, it lacks merit because plaintiff has failed to highlight any specific actions Connell undertook as an officer (as distinct from actions as a director) that fall within the two pertinent exceptions to Section 102(b)(7). *See* R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corp. & Business Org.* § 4.19, at 4–335 (Supp.1992) (where a defendant is a director and officer, only those actions taken solely in the defendant's capacity as an officer are outside the purview of Section 102(b)(7)).[37]

### C. Waiver of the Section 102(b)(7) Shield

■ Plaintiff argues that the individual defendants can, and did, waive their Section 102(b)(7) contractual protection. The individual defendants "are prepared to assume" that the shield provided by Section 102(b)(7) can be waived, but argue that such waiver must be clear and unambiguous, which they contend is absent here.[38] We agree.

---

would be a misinterpretation of *Zirn* to conclude that the case subsumed Delaware's disclosure obligations solely within the duty of loyalty).

**33.** In support of this latter argument, plaintiff cites *Mills Acquisition Co. v. MacMillan, Inc.*, Del.Supr., 559 A.2d 1261, 1287 (1988), and *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946, 954 (1985).

**34.** That rule states in relevant part: "Only questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, the Court may consider and determine any question not so presented." Supr.Ct.R. 8.

**35.** The Court finds unpersuasive plaintiff's contention during oral argument that defendants' intentional decision to disseminate the proxy statement leads ineluctably to a finding that they deliberately violated their disclosure obligations.

**36.** We agree with defendants that, on this record, the single disclosure violation which we have found was consistent only with a good faith omission. Thus, the equitable fraud claim argued in *Zirn*, 621 A.2d at 783, is inapplicable under the facts of this case.

**37.** Plaintiff's argument that Connell and Stang were interested directors who violated the duty of loyalty is without merit.

**38.** The Court does not decide, but only assumes *arguendo*, that directors of Delaware corporations can waive their Section 102(b)(7) protection because the parties have so stipulated. In any event, as discussed *infra*, we find that the individual defendants did not waive the shield.

The individual defendants did not waive their Section 102(b)(7) protection. "The standard for finding waiver in Delaware is quite exacting. 'Waiver is the voluntary and intentional relinquishment of a known right.... It implies knowledge of all material facts and intent to waive.' Moreover, 'the facts relied upon must be unequivocal in nature.'" *American Family Mortgage Corp. v. Acierno*, Del.Supr., No. 290, 1993, *slip op.* at 12, 1994 WL 144591 *5, Moore, J. (Mar. 28, 1994) (ORDER) (quoting *Realty Growth Inv. v. Council of Unit Owners*, Del.Supr., 453 A.2d 450, 456 (1982)) (internal citations omitted). In the instant case, the following colloquy occurred in the Court of Chancery during argument on plaintiff's motion for a preliminary injunction:

> MR. ZIEGLER [defense counsel]: ... [T]here are remedies available to this plaintiff if in the end, after a trial, it should turn out—if there needs to be a trial—that any of these added bits of information could be determined, in fact, to have been material and not confusing, so that the balance of equities clearly favors letting this transaction proceed to a closing.
>
> If the Court has no questions—
>
> THE COURT: Finish that thought for me. I didn't really—if there were ... misleading disclosures, how would I remedy those if they weren't corrected at this stage, after a trial?
>
> MR. ZIEGLER: Your Honor, it has—I believe this Court has fashioned remedies in such circumstances. In addition, in the *Ocean Drilling* case, the Court concluded in fact—denied an injunction in much more

colorable circumstances than we have here on the ground that because it was a stock-for-stock exchange, a quasi-appraisal remedy could be fashioned. **I believe the Court could attempt to determine the value of non-disclosures, so to speak, or determine a quasi-appraisal remedy.**

(Emphasis added). Plaintiff's interpretation of the reference to "the value of non-disclosures" hardly constitutes the unequivocal facts necessary to find a voluntary, intentional relinquishment of the protection of Section 102(b)(7). Thus, plaintiff's waiver argument lacks merit.

## VII. "*REVLON* CLAIM"

 Plaintiff argues that the Court of Chancery erred in holding that *Revlon*[39] was not "triggered" under the facts of this case because (i) Bancorp was seeking to sell itself and (ii) the Merger constituted a change in control. He contends that the board breached its "*Revlon* duties."[40] Defendants contend that *Revlon* was not implicated and, even if it were, they fulfilled their duties. They further argue that, even if their conduct fell short of the requirements of *Revlon*, Bancorp stockholders ratified any improprieties by voting in favor of the Merger.[41] The Court of Chancery held that *Revlon* was inapplicable under the facts of this case because the Merger did not involve a change in control.[42] We agree.[43]

 The Court need not apply enhanced scrutiny under the circumstances of this case. The directors of a corporation "have the obligation of acting reasonably to

39. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173 (1986).

40. Presumably, plaintiff is referring colloquially but inappropriately to the enhanced scrutiny courts accord to certain types of transactions described *infra*. *See* Lawrence A. Cunningham & Charles M. Yablon, *Delaware Fiduciary Duty Law After QVC and Technicolor: A Unified Standard (and the End of Revlon Duties?)*, 49 Bus. Law. 1593, 1593–94 (1994) (noting inappropriateness of such colloquialisms as "*Revlon* duties" and "*Revlon*-land" in arguments before this Court).

41. To combat defendants' argument that Bancorp stockholders ratified any improprieties, plaintiff argued in the Court of Chancery that defendants were liable for corporate waste,

which if proven purportedly requires a unanimous stockholder vote to constitute ratification. Plaintiff appears to have abandoned his corporate waste claim on appeal.

42. Opinion at 20–25. The trial court declined to reach the stockholder ratification issue in light of this holding. This Court similarly does not reach the issue.

43. In agreeing with the conclusion reached by the Vice Chancellor we do not necessarily adopt all of that court's language, Opinion at 20–25, but note merely that the language of *Paramount Communications, Inc. v. QVC Network, Inc.*, Del. Supr., 637 A.2d 34 (1994), controls on this issue.

seek the transaction offering the best value reasonably available to the stockholders," *Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr., 637 A.2d 34, 43 (1994), in at least the following three scenarios: (1) "when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company," *Paramount Communications, Inc. v. Time Inc.*, Del. Supr., 571 A.2d 1140, 1150 (1990) [*Time–Warner* ]; (2) "where, in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the break-up of the company," *id.;* or (3) when approval of a transaction results in a "sale or change of control," *QVC*, 637 A.2d at 42–43, 47. In the latter situation, there is no "sale or change in control" when " '[c]ontrol of both [companies] remain[s] in a large, fluid, changeable and changing market.' " *Id.* at 47 (citation and emphasis omitted).[44]

In the instant case, the events transpiring between May 28, 1992 (when the board rejected the May Proposal), and August 31, 1992 (when the board approved the Merger), and thereafter do not fit the circumstances requiring enhanced scrutiny of board action. Plaintiff emphasizes *Time–Warner*'s language "seeking to sell itself" in arguing that *Revlon* was implicated, but that argument fails because, to fall within that category, the target must have "initiate[d] an active bidding process." *See Time*, 571 A.2d at 1150. He also focuses on the board's subjective intent, a basis for enhancing director's duties which was rejected in *Time–Warner. See id.* at 1151.

Alternatively, plaintiff argues that there was a "sale or change in control" of Bancorp because its former stockholders are now relegated to minority status in BoB, losing their opportunity to enjoy a control premium. As a continuing BoB stockholder, plaintiff's op-

portunity to receive a control premium is not foreclosed.[45] Thus, plaintiff's claim that enhanced scrutiny is required under the circumstances of this case lacks merit and the Court of Chancery did not err in so holding.

## VIII. CONCLUSION

We hold that the Court of Chancery erred in rejecting plaintiff's claim that an appropriately explained reference to the FAC bid in the context of the historic disclosures made in the proxy statement was required. We do not reach plaintiff's claim that the contingent FAC bid was material and had to be disclosed regardless of the partial disclosures in the proxy statement. We affirm the Court of Chancery in all other respects.

We further hold that Article XIII of Bancorp's certificate of incorporation shields the individual defendants from liability, and that the liability shield was not waived. Finally, we hold that the circumstances of this case do not require heightened scrutiny of the board's approval of the Merger and thus plaintiff's claim premised on a contrary argument lacks merit.

We therefore **REVERSE** the judgment of the Court of Chancery dismissing the action based on its grant of summary judgment to defendants, and denial of plaintiff's cross-motion for partial summary judgment solely as to the FAC nondisclosure claim based on the partial disclosure theory. Accordingly, we **REMAND** that claim and plaintiff's aiding and abetting claim against BoB to the Court of Chancery for proceedings consistent with this opinion. We **AFFIRM** in all other respects the denial of plaintiff's cross-motion for partial summary judgment. We also **AF-FIRM** the grant of summary judgment by the Court of Chancery to defendants as to plaintiff's second, third, and fourth disclosure claims, and his *"Revlon* claim."

---

**44.** *See also* Marcel Kahan, *Paramount or Paradox: The Delaware Supreme Court's Takeover Jurisprudence*, 19 J.Corp.L. 583, 595 (1994) ("What is important about the fact that 'control' remains in the hands of unaffiliated shareholders, 'in the market,' is that all these unaffiliated shareholders have virtually identical interests with respect to the company: to maximize the value of their shares.").

**45.** *See QVC*, 637 A.2d at 47–48 (finding, under the facts of that case, that a single person would have control of the surviving corporation and the stockholders would lose their opportunity to command a control premium). *See also supra* part V.A., note 20.

With regard to the issue or issues before the Court of Chancery on remand, we decide only that there is no liability as to any individual defendant. We do not decide whether or not there is any remedy as to any corporate defendant. We leave it to the Court of Chancery to determine whether or not any such remedy is appropriate and, if so, to fashion such a remedy. Jurisdiction in this Court is not reserved.