NEW CASTLE COUNTY DEPART-
MENT OF LAND USE and New Cas-
tle County Board of Assessment Re-
view, Appellees Below, Appellants.

v.

UNIVERSITY OF DELAWARE,
Appellants Below, Appellee.

No. 96, 2003.

Supreme Court of Delaware.

Submitted: Dec. 9, 2003.

Decided: Feb. 2, 2004.

Reargument Denied March 11, 2004.

**1202**

Michael P. Kelly, A. Richard Winchester, and Katharine L. Mayer, Esquires, of McCarter & English, LLP, Wilmington, Delaware; Mary Ann Kelly, Assistant County Attorney, New Castle, Delaware, for Appellees Below, Appellants.

William E. Manning, Richard A. Forsten, and James D. Taylor, Jr., Esquires, of Klett Rooney Lieber & Schorling, Wilmington, Delaware, for Appellants Below, Appellee.

Before VEASEY, Chief Justice, BERGER, STEELE and JACOBS, Justices, and HARTNETT, Justice (Retired),[1] constituting the Court en Banc.

JACOBS, Justice.

The New Castle County Board of Assessment Review (the "Board") and the New Castle County Department of Land Use (collectively, the "County") appeal from an order of the Superior Court reversing a decision by the Board upholding a property tax assessment on approximately 725 square feet of space located in the Trabant Student Center at the University of Delaware. For several years the University has leased that space to Wilmington Savings Fund Society ("WSFS") for use as a small branch that provides banking services and also furnishes a multipurpose student identification card that serves as both a "MAC" and a debit card for on and off-campus purchases.

The sole issue presented on this appeal is whether that leased space is exempt from property taxation on the ground that its use is for a "school purpose" within the meaning of 9 *Del.C.* § 8105. That statute exempts from taxation "[p]roperty belonging to . . . any college or school and used for educational or school purposes . . . ."[2]

For the reasons next discussed, we hold that the leased space is being used for a "school purpose" within the contemplation of § 8105, and is tax exempt. Accordingly, we affirm the judgment of the Superior Court.

### Facts

The Student Center, which was built in 1996, is located on West Main Street in Newark, Delaware, on property that is owned by the University of Delaware. The Student Center houses numerous uses and activities relating to the University and to student life in addition to that small WSFS bank branch. Those uses and activities include offices for administration and student activities, a branch of the University bookstore, a movie theatre/lecture

---

1. Sitting by designation pursuant to DEL. CONST Art. IV, § 38 and DEL. CODE ANN. tit.29, § 5610(q)(2)(2001) and DEL. SUPR. CT. R. 2, 4.

2. The identical issue is also raised under a parallel provision (§ 14.06.101 (2002)) of the New Castle County Code. Because the language of the County ordinance is nearly identical to that of the state statute (except that the ordinance contains other language that is not relevant here), the Superior Court disposed of the appeal through analysis of the state statute only. We do likewise.

hall, a box office, multiple dining facilities (including the University's Hotel and Restaurant Management training restaurant and various for-profit "fast food" establishments), a for-profit travel agency and a study lounge. Similar services provided by third party vendors are offered in other facilities located throughout the University campus.

The presence of WSFS at the Student Center was a result of the University issuing a Request for Proposals, which solicited proposals from banks to provide a card that would (1) serve as a traditional student identification card, (2) permit students to access MAC machines, and (3) enable students to use it as a debit card both on and off-campus. WSFS was the only bank that responded to the Request for Proposals.[3] Thereafter, the University and WSFS formalized their relationship in a Banking Partnership Agreement into which those parties entered on June 15, 1998.

The combination ID/MAC/debit card that is issued by WSFS is a critical component of that Banking Partnership arrangement. It is intended to eliminate the need for students to carry two cards and also to afford most, if not all, area merchants the opportunity to accept the University's card. The card aids the University's students by providing a safe and easy way to manage their money while at the same time avoiding the need for students to carry large amounts of cash or to keep cash in their dormitory rooms. The bank

branch also benefits the University, because WSFS is required to offer accounts to University employees without any service fee for direct deposit of paychecks. The services offered by the WSFS branch are one part of a larger array of other services that for years the University has provided to its students, including food, travel, insurance, books and supplies, health services, apparel, telecommunications and entertainment.

The WSFS branch at the Student Center is used almost exclusively by University Students, faculty and employees. Although the University charges WSFS a nominal rent for the leased space, that nominal rent is designed solely to defray costs, and does not generate a "profit" for the University. Initially, the University provided WSFS with only 341 square feet of space at no rent. But, the services provided by WSFS proved to be so popular that WSFS requested, and the University agreed to lease to WSFS, an additional 385 square feet of space, for a nominal rent of $12 per square foot to defray maintenance, utilities, security, custodial services and insurance. The County's assessor agreed that that rent was less than half the market rent WSFS might otherwise pay. If spread across the entire 726 square feet of leased space, that rent averages out to $6.36 per square foot, which does not fully cover the University's costs. WSFS has informed the University that it is not profiting from the bank branch ei-

---

3. The University suggests, and the County does not dispute, that the reason for the poor response to the Request for Proposals was that students are not a bank's preferred customer. A banking relationship with approximately 11,500 students brings with it certain risks and costs. College students typically have very small (or no) incomes, maintain small bank balances, and have a disproportionate number of overdraws on their ac-

counts, all resulting in small margins for the bank serving that market. Moreover, because college students do not seek loans from WSFS, that bank (and any similarly situated bank) will not reap the interest income that it might otherwise earn at a traditional branch. Indeed, several banks were unwilling to establish a branch on the University campus because student accounts were viewed as not profitable.

ther.[4]

At the time that the WSFS branch began operations at the Student Center, the County did not seek to tax the leased space. Nor had the County ever sought to tax the branch bank that was located in the University's previous student center. In January 2001, however, the County abandoned its policy of exempting property owned and used by institutions of higher education, and for the first time sought to tax the 726 square feet of space under lease to WSFS at the Student Center. As noted, the Board of Assessment determined that that space was not exempt from taxation and upheld the assessment. The University appealed to the Superior Court, which reversed the Board's determination in a Memorandum Opinion.[5] The County then appealed the Superior Court's reversing order to this Court.

### The Issue Presented, The Parties' Contentions, And The Standard of Review

This appeal presents a single issue, which is whether the space under lease to WSFS at the University's Student Center is being used for a "school purpose" within the meaning of 9 *Del. C.* § 8105. That statute pertinently provides that:

Property belonging to . . . any college or school and used for educational or school purposes, except as otherwise provided, shall not be liable to taxation and assessment for public purposes by any county or other political subdivision of this State.

The Superior Court held that in upholding the tax assessment, the Board had

erred by failing to accord separate meanings to the terms "educational" and "school" purposes. The University did not (and does not) contend that the WSFS bank branch is being used for "educational" purposes. Accordingly, the focus of the dispute was—and is—over whether the space leased to WSFS is being used for "school," as opposed to "educational," purposes. The Superior Court held that it was, reasoning as follows:

Here, the character of the property leased by the University to [WSFS] for banking services demonstrates a University community need that fulfills a "school" purpose. The Court finds that by locating a banking facility within the Student Center, the University has met an objective not that remote from the *Burris*[6] Court's emphasis of "convenience" and "efficient administration relative to student learning and the daily living of all members of the University community; this is particularly true since one "purpose" of an institute of higher education is to provide a safe and efficient means for its students to attend classes and otherwise enrich themselves, as well as to provide for the appropriate "convenience" of those associated with the University. And if the nearest bank were, hypothetically, many miles distant from the University, there would indisputably be a heightened and important convenience to all members of the University community for banking services to be available at the University. . . .

\*   \*   \*   \*   \*   \*

---

4. Even if there were net revenue, WSFS would be forced to share that revenue with the University under the Banking Partnership Agreement.

5. *University of Delaware v. New Castle County Department of Land Use, et al.,* C.A. No. 02A–

03–001, 2003 WL 220509 (Del.Super., January 30, 2003) ("Opinion").

6. Referring to *Burris v. Tower Hill School Ass'n,* 179 A. 397 (Del.Super.1935).

When one thinks of a "school" as encompassing the body of students, faculty, administrators and employees which constitute the institution's makeup, it is not illogical to view "enhanced levels of banking service" directed at those persons as serving a "school" purpose; this is to be contrasted with the term "education," which, as noted above, is more directed to the actual process of learning itself.[7]

\* \* \* \* \* \*

When section 8105 is considered as a whole, with separate effect given to "educational" and "school" purposes, "school purposes" means the promotion of the legitimate convenience of some or all members of the University community....[8]

On appeal, the County advances a plethora of arguments to support its position that in finding the leased space exempt from taxation, the Superior Court committed reversible error. Those arguments are fairly reducible to three basic claims.

The County's first claim is that by adopting a criterion of "convenience," the Superior Court failed to give effect to the plain meaning of the term "school purpose" found in § 8105. That phrase (the County argues) plainly means a purpose that has as its intended object, end or aim, the pursuit or dissemination of knowledge by students and teachers. Because the furnishing of banking and related services by the University does not have as its aim the pursuit or dissemination of knowledge, the WSFS space is not being used for a "school purpose." Unless the trial court's ruling is reversed, the County urges, the result will be to "open the floodgates" and potentially render tax exempt all property

owned by schools and universities, regardless of how remote that property's use may be from the pursuit or dissemination of knowledge.

The County's second claim is that that even if the term "school purpose" has no plain meaning, the Superior Court arrived at the wrong result by committing two fundamental errors of statutory construction. The first claimed error of construction is that the court misread the case law that interprets § 8105, and its statutory phrase "educational or school purposes," as expressing essentially a single standard. Alternatively (the County urges), even if "school purposes" is properly viewed as a separate and distinct standard, the court misapplied it by ignoring the rule of construction that requires a narrow interpretation of statutes creating exemptions from taxation, with any doubts being resolved in favor of the public and against the claimed exemption.

The County's third claim is that the Superior Court, sitting as a tribunal reviewing a decision of the Board, failed to apply the proper standard of review, under which the Board's decision is prima facie correct, with the appellant having the burden to show that the Board acted "contrary to law, fraudulently, arbitrarily or capriciously."[9]

■ All three contentions involve a purely legal question. The County's first two arguments advance, in different forms, the position that the Superior Court erred as a matter of law in construing the applicable tax exemption statute. The County's third argument—that the Superior Court was required to accord deference to the Board's decision unless the decision is "contrary to law,"—poses the same legal

7. Opinion, at 23.

8. *Id.* at 25.

9. The quoted language is found in 9 *Del. C.* § 8312, upon which the County relies.

issue, *i.e.*, whether the Superior Court (and the Board) erroneously interpreted the statute. The construction of statutes is a purely legal determination that the Superior Court and this Court review *de novo*.[10]

We first address each of the County's three claims of error, and conclude that they lack merit. Because the issue presented here is one of first impression, we then turn to, and evaluate independently, the Superior Court's interpretation of the statutory term "school purpose," to afford guidance in future cases.

### The "Plain Meaning" Argument

As noted, the County first argues that the Superior Court erroneously failed to accord the statutory term "school purpose" its plain meaning. The issue underlying that argument, *i.e.*, what is the meaning of the phrase "school purpose," is one of first impression. Although the Superior Court observed that there is no legislative history for the Court to rely upon, there is historical background that, although modest, aids this Court's own analysis.

The present § 8105 is the successor to a statute that was first enacted in 1796, and amended from time to time thereafter. Its first appearance was in *Vol. 2, Laws of Delaware, Ch.* XCVIII, p. 1247, which provided:

That all real and personal property in this state, not belonging to this state, or to the United States, or to any church, county, religious society or parish, or to any college, or to any county school, or

to any corporation for charitable uses, shall be valued agreeably to the directions of this act, and shall be chargeable according to such valuation with the public assessment....

Thus, as originally enacted, the statute exempted from taxation any property belonging to any "college...or...county school," without any limitation upon how the property could be used.

In 1893, the statute was amended (in pertinent part) to read:

All real and personal property not belonging to this State, or the United States, or any county, church, religious society, college or school, or to any corporation for charitable uses, shall be liable to taxation and assessment for public purposes....[11]

Thus, the 1893 statute exempted from taxation "property...belonging to ...any...college or school," again without limiting how that property could be used.[12]

In 1909, however, the General Assembly again amended the statute to limit, for the first time, the permissible uses of property owned by any college or school, for that property to qualify as tax exempt. The 1909 amendment modified the 1983 statute to add to the phrase "belonging to...any...college or school..." the language *"and used for educational or school purposes ..."*[13] The result of that amendment was to qualify as tax exempt, property that was owned by any college or school and that was used for educational or school purposes. That phraseology ("educational or school purposes") has survived in this

---

10. *Arnold v. Society for Savings Bancorp, Inc.*, 650 A.2d 1270, 1287 n. 30 (Del.1994).

11. *Revised Code of The State of Delaware*, as published in 1893, Chap. XI, Sec. 1.

12. Because the 1893 statute provided that "all...property...*not* belonging to...any...college or school..." would be

taxable, it follows, *a fortiori* from the converse of that negative expression, that all property belonging to any college or school would *not* be taxable.

13. 25 *Del. Laws*, Chap. 36, Sec. 1 (1909) (italics added).

form from 1909 to the present, and is found in the current § 8105.

■ The issue is what uses the General Assembly contemplated by its choice of the term "school purposes." The statute does not answer that question, because it leaves that term undefined. Moreover, the phrase "educational or school purposes" has been construed only once, almost seventy years ago, by the Superior Court in *Burris v. Tower Hill School Association*,[14] and even there the court did not separately construe the term "school purpose" (as distinguished from "educational purpose"). In these circumstances, the Superior Court determined that it must analyze § 8105 according to its own terms. That conclusion was correct, because undefined words in a statute must be given their ordinary, common meaning.[15]

■ In its effort to fathom the meaning of the statutory term "school purposes," the Superior Court next determined that by including the word "school" in the phrase "used for educational or school purposes," the General Assembly must have intended that "school purposes" would have a meaning different from "educational purposes." That conclusion, although vigorously disputed by the County, is supported by the legislative history discussed above, and it is also consistent with the presumption against construing words in a statute as surplusage if there is a reasonable construction that will give them mean-

ing.[16] The Superior Court's finding that "educational purposes" and "school purposes" have distinct, separate meanings is also consistent with, and is buttressed by, the fact that the dictionary definitions of those two terms are different. As that court noted, "education" is defined as:

> **1:** the act or process of educating or being educated....**2 a:** a process or course of learning, instruction or training that educates or is intended to educate.... **b:** a system of formal education as a whole.... **3:** the product of an education [17]

"School," however, is defined differently as:

> **1a** (1): an organized body of scholars and teachers associated for the pursuit of and dissemination of knowledge (as in a particular advanced field) and constituting a college....**1b** (1): the pupils or students attending a school....(2): the members of a school including both faculty and students [18]

Accordingly, the Superior Court concluded (as do we) that the term "education" focuses on the "act or process" of educating or learning, while the term "school" refers to the "organized body" of students, faculty, administrators, and employees who come together as a *community* to engage in the "act or process" of education.

The County's contrary argument also relies upon dictionary definitions as a tool

14. 179 A. 397 (Del.Super.1935).

15. *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d 892, 900 (Del.1994).

16. *Id.;* ("[W]ords in a statute should not be construed as surplusage if there is a reasonable construction which will give them meaning...and courts must ascribe a purpose to the use of statutory language, if reasonably possible."); Norman A. Singer, *Statutes and Statutory Construction*, § 46.06, at 193 (Rev.

2000) (popularly known as "Sutherland Statutory Construction") ("[L]ike [] [the presumption that the same words used twice in the same act have the same meaning], the courts do not construe different terms within a statute to embody the same meaning.")

17. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 723 (1961).

18. *Id.* at 2031.

of "plain meaning" statutory construction. The County, however, limits itself to the definitions of the terms "school" and "purpose," and it then selectively combines those definitions to arrive at the opposite conclusion. The dictionary definition of "purpose," the County says, is:

> 1 a: something that one sets before himself as an object to be attained: an end or aim to be kept in view, in any plan, measure, exertion, or operation....1 b: an object, effect, or result aimed at, intended or attained.... [19]

The primary definition of "school," the County then argues, is "an organized body of scholars and teachers associated for the pursuit and dissemination of knowledge." [20] Combining those two definitions, the County concludes that a "school purpose" must be one that has as its intended object, end or aim, the pursuit of or dissemination of knowledge by students and teachers. The County argues that "[t]he Legislature surely did not intend to confer tax exempt status upon a use (such as the Bank)... "that does not have as its intended aim or object [the] achievement of the University's prime function: the teaching of students..." Therefore (the County says), the Superior Court's conclusion that the WSFS branch—which "exists only to serve the ancillary commercial needs of the University's constituencies and the public"—is tax exempt, ignores the plain meaning of "school purpose" as used in § 8105.

The County's argument is flawed, not only because of its selective choice of dictionary definitions, but also and more fundamentally because it makes no effort to address the distinct meanings of "educational" and "school" and to give those different meanings functional effect. The County's analysis focuses on the defini-

tions of the terms "school" and "purpose," but ignores altogether the highly different definition of "educational." The County also ignores the primary thrust of the definition of "school," which focuses upon the community of persons and roles that comprise an educational institution. Instead, the County selects but one (but not the only) important activity in which that community is engaged: imparting and receiving knowledge. The result of that result-oriented analysis is to conflate the two different terms "educational" and "school" into a single undifferentiated term: "educational."

In defense of its approach, the County urges that, unless rejected, the Superior Court's statutory construction will open the floodgates and potentially exempt from taxation, all property owned by schools, colleges, and universities, even if that property is used in a manner that is unrelated to the objective of imparting and receiving knowledge. Therefore, this Court must draw a bright line that proscribes all tax exemptions for school-owned property, except for property that is used to impart or receive knowledge.

In our view, if any statutory interpretation would "open the floodgates" to results that, in the absence of a clear statutory mandate, could not rationally be attributed to the legislature, it is the construction advocated by the County. As the Superior Court aptly noted in its Opinion:

> [I]f a small branch bank that provides admittedly "convenient" banking services to the University community is not to be exempt from property taxation in that it does not serve a "school purpose," then what of the bank's ATM machines situated around the campus? Should the dining facilities, the travel

19. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 1847 (1961).

20. *Id.* at 723.

office, the bookstore, and/or the movie theatre/lecture hall (all located within the Student Center) similarly be taxed as not furthering "school purposes?" What about space provided to telecommunications providers elsewhere on University property? Indeed, the County acknowledged at oral argument that University parking lots do serve "school purposes," and should not be subject to property taxation.

■ The Superior Court was not persuaded by the County's argument, and neither are we. In construing the statute, that court did not ignore the plain meaning of the term "school purpose," nor did it err in refusing to accept the County's argued-for plain meaning of that term. As discussed elsewhere in this Opinion, the WSFS branch, like the rest of the University's campus and its accompanying student services, contributes to the welfare, convenience and safety of the University community. That property is, therefore, being used for a "school purpose," and to the extent the County claims otherwise, its position lacks merit and is rejected.

### The Statutory Misconstruction Argument

The County's second argument, which comes in two parts, is that even if the statutory term "school purpose" has no plain meaning, the Superior Court accorded that term the wrong meaning, by committing two distinct errors of statutory construction.

First, the County claims, the Superior Court misread the case law interpreting § 8105, which (the County says) construes the phrase "educational or school purposes" as articulating only one single standard. To say it differently, the County

claims that the Superior Court's conclusion that the terms "educational purpose" and "school purpose" had separate, distinct meanings, is erroneous.

This claim merely restates, in the form of a primary argument, a proposition that the County previously advanced—and that this Court rejected—as a subsidiary argument in the "plain meaning" context. This argument was rejected, because it would reduce the term "school purpose" to meaningless surplusage, and also would do violence to the presumption that the legislature intended to give meaning to each term used in the statute.

The County insists, nonetheless, that the phrase "educational or school purposes" must be found to articulate a single standard, because that phrase was so construed in *Burris v. Tower Hill School Association*. In that case, the County sought to tax a residence that was owned by Tower Hill School and used as a home for the school's headmaster. Tower Hill, which was (and is) entirely a day school, admitted that the residence, which was located one block from Tower Hill's campus, was used for no other purpose. Given those facts, the *Burris* court declined to exempt the property from taxation, finding that although the property benefited the headmaster (as his personal residence), it did not further any interest of the school.[21]

The County insists that because the *Burris* court did not explicitly distinguish between the words "educational" and "school," it implicitly determined that the phrase "educational or school purpose" represents a single standard. But the County's conclusion does not follow from its premise. In *Burris*, the court's analysis and result did not turn on the distinc-

21. 179 A. at 399 (stating that "the interest of [the] school...[is not]...furthered in any way by the use of the property.")

tion between "educational" and "school" purpose. Nor was it necessary for the *Burris* court to consider any such distinction, because the school was advancing the blanket argument that the headmaster's residence was being used for an "educational or school purpose," without making any effort either to parse or differentiate the two terms, or to advocate a separate definition of "school purpose."

Indeed, *Burris* is more supportive of the University's position than of the County's. In distinguishing cases relied upon by Tower Hill School on the ground that they involved colleges or boarding schools, the court stated:

> [The cited cases] have to do with colleges or boarding schools, and the rationale of the decisions is the reasonable necessity for the acquisition and maintenance of presidential and professorial residences in close proximity to the student body for inspirational, supervisional or disciplinary purposes, or as a convenient place for holding meetings and social affairs in connection with the institution....
>
> \* \* \* \* \* \*
>
> The considerations impelling the courts in the cases cited are entirely absent from the case before the court. Here the school is a day school. The sole use of the property is as a residence for the headmaster. All of the duties of the headmaster may be performed at the school, and it is not intimated that these duties are not, in fact, performed at the school....
>
> ....[T]here is nothing to indicate that the residence is used as an office for the head-master, or as a necessary and convenient place[to] interview[ ] prospective students or for conducting correspondence relating to the school.[22]

The clear implication of this reasoning is that if Tower Hill were a college or a boarding school, the headmaster's residence would not be taxable, even if the residence was not being used for any other purpose. That is significant, because the University of Delaware is a college that furnishes room and board to its students, most of whom live on campus. Because Tower Hill, unlike the University, was only a day school, the *Burris* court held that for the headmaster's residence to be tax exempt, some school-related activities had to be conducted there, but none were. *Burris* does not aid the County's position here.

■ The County's second, alternative argument is that even if the term "school purposes" denotes a distinct, separate standard, the court misapplied it by ignoring the rule of construction that requires a narrow interpretation of statutes that create exemptions from taxation, with any doubts being resolved in favor of the public and against the claimed exemption. This argument also misses the mark, because it misapprehends the applicable rule of construction. Although statutes creating tax exemptions are to be construed narrowly in the ordinary case, *Burris* itself recognizes that "[s]tatutes exempting from taxation property devoted to educational purposes are in general *construed more liberally than other tax* exempting *statutes.*"[23]

In short, the Superior Court, did not misread the case law or apply erroneous principles of statutory construction in arriving at the result that it reached.

### The Argument That The Court Did Not Give Proper Deference To The Board's Determination

The County's final claim of error is that the Superior Court, sitting as a tribunal

---

**22.** 179 A. at 399.

**23.** *Burris,* 179 A. at 399–400 (italics added).

reviewing a decision of the New Castle County Board of Assessment Review, failed to accord proper deference to the Board's expertise in the area of taxation, because the court reviewed the Board's decision under an improper standard. The correct standard, the County argues, is that the Board's finding that the leased space is taxable, must be deemed to be prima facie correct, with the appellant having the burden to show that the Board acted contrary to law, fraudulently, arbitrarily or capriciously.

■ The short answer is that administrative agencies and boards are afforded no such deference on questions of statutory construction. As we have previously held:

> Statutory interpretation is ultimately the responsibility of the courts. A reviewing court may accord due weight, but not defer, to an agency interpretation of a statute administered by it. A reviewing court will not defer to such an interpretation as correct merely because it is rational or not clearly erroneous.[24]

Accordingly, the Superior Court committed no error by construing § 8105 *de novo.*

### The Trial Court's Construction Of The Term "School Purpose"

Although we conclude that the Superior Court committed no legal error in its reasoning or result, the analysis cannot end here. Because this important issue of statutory construction is of first impression, this Court's institutional role, and the public need for guidance in future cases, requires us to proceed further and review *de novo* the Superior Court's interpretation of the phrase "school purposes." We find that that court's articulation, although not incorrect, is unduly narrow, and that the scope of the definition of "school purpose" must be enlarged to capture more fully the values that are embedded in that phrase.

The Superior Court held that "school purposes" means "the promotion of the legitimate convenience of some or all members of the University community."[25] That activity, to be sure, is one element of a larger constellation of activities that may properly be described as "school purposes," but the Superior Court's formulation does not comprehend, or completely describe, the totality of those elements. As used in the statute, the word "school" (as distinguished from "education") is a generic term that describes a diversity of educational institutions, including (without attempting to be exhaustive) primary and secondary schools, universities and other post-secondary educational institutions. Each of these institutions is devoted in a unique way to educating the students who attend it. To accomplish that goal in present-day American society, those institutions are organized into communities that include (among their many members) students, faculty, administrative and support staff, and providers of goods and services.

In the case of the University of Delaware, most of whose students live on the campus full-time during the school year, those goods and services include (to name but a few) food, living quarters, books, parking facilities, medical facilities, and a security force. They also include ATM and credit/debit cards to enable students, faculty and other members of the university community to purchase the goods and services they need to function in their respective roles within that community.

Given the multidimensional complexity of the school "community" and the compo-

---

24. *Public Water Supply Co. v. DiPasquale,* 735 A.2d 378 (Del.1999).

25. Opinion, at 25.

nent constituencies and activities that characterize the diverse "schools" of almost every variety that exist in Delaware, a more comprehensive formulation of "school purpose" is needed than the one articulated by the Superior Court. The reason is that furthering the "convenience" of the school community and its members is only one dimension of the ever-evolving array of activities in which schools and their constituencies legitimately engage to carry out their educational goals. Two other critical dimensions are furthering the safety and the welfare of those communities.

█ In our view, therefore, a more appropriate formulation of "school purposes" is that the use of the school-owned property must contribute to the legitimate welfare, convenience, and/or safety of the school community or its members. That formulation better captures the complex reality that the generic term "school purposes" is intended to denote. At the same time, it draws a clearer line that will aid the taxing authorities and schools in distinguishing between uses of school-owned property that are properly tax exempt, and those that are not.

Although this formulation may sweep more uses of school-owned property into the tax exempt category than it will exclude, that is not the result of any policy judgment by this Court. Rather, it is the consequence of the language chosen by the General Assembly to designate which uses of school-owned property will be taxable, and which will not be. It is for the General Assembly alone to make that determination, not the courts. The only legitimate role of courts that are called upon to interpret an enactment by the General Assembly is to divine, and then effectuate as closely as possible, the legislative intent. The formulation adopted here represents this Court's best effort to carry out that role.

### Conclusion

For the reasons set forth, the judgment of the Superior Court is affirmed.