# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| IN RE ORACLE CORPORATION DERIVATIVE LITIGATION | ) CONSOLIDATED<br>) C.A. No. 2017-0337-SG |

## MEMORANDUM OPINION

Date Submitted: February 16, 2021
Date Decided: June 21, 2021

Joel Friedlander and Jeffrey M. Gorris, of FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; OF COUNSEL: Randall J. Baron and David A. Knotts, of ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Christopher H. Lyons, of ROBBINS GELLER RUDMAN & DOWD LLP, Nashville, Tennessee; Brian J. Robbins, Stephen J. Oddo, and Gregory Del Gaizo, of ROBBINS LLP, San Diego, California, *Attorneys for Lead Plaintiff Firemen's Retirement System of St. Louis*.

Kenneth J. Nachbar, John P. DiTomo, and Thomas P. Will, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Sara B. Brody and Jaime A. Bartlett, of SIDLEY AUSTIN LLP, San Francisco, California; Matthew J. Dolan, of SIDLEY AUSTIN LLP, Palo Alto, California, *Attorneys for Defendants Jeffrey O. Henley, Renée J. James, and Paula R. Hurd as Trustee of the Hurd Family Trust*.

Thomas A. Beck, Blake K. Rohrbacher, Susan M. Hannigan, Matthew D. Perri, and Daniel E. Kaprow, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Nominal Defendant Oracle Corporation*.

Kevin R. Shannon, Berton W. Ashman, Jr., of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Arthur H. Aufses, Jonathan M. Wagner, and Jason M. Moff, of KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York, *Attorneys for Non-Party Special Litigation Committee of the Board of Directors of Oracle Corporation*.

Elena C. Norman, Nicholas J. Rohrer, Richard J. Thomas, Benjamin Potts, and Kevin P. Rickert, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: Peter A. Wald, of LATHAM & WATKINS LLP, San Francisco, California; Blair Connelly, of LATHAM & WATKINS LLP,

New York, New York, *Attorneys for Defendants Lawrence J. Ellison and Safra A. Catz.*

**GLASSCOCK, Vice Chancellor**

This is my fifth memorandum opinion in this matter, and yet the case is still in the motion to dismiss stage. Not coincidentally, the Motions to Dismiss before me are addressed to the Fifth Amended Complaint. The number of complaints is not due to the vagaries, indecision, or frolicsome nature of the Plaintiffs' counsel—the matter has been procedurally complex due in part to the improbable progression of this derivative action through a special litigation committee and back to the Plaintiffs. At this stage, the facts relating to a challenged acquisition by Oracle Corporation of a competitor are well rehearsed. I commend interested readers to my Memorandum Opinions of March 19, 2018[1] and June 22, 2020[2] for a full overview, albeit based on earlier iterations of the complaint. For this Motion to Dismiss, brought by three individual defendants, an abbreviated factual background sufficient to resolution of the motions is laid out below. I then address the merits of the Motions, with mixed results.

## I. BACKGROUND[3]

The Plaintiffs, stockholders of Oracle Corporation ("Oracle"), challenge Oracle's acquisition of NetSuite, Inc. ("NetSuite") as a controlled self-dealing

---

[1] *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331 (Del. Ch. Mar. 19, 2018) [hereinafter "*Oracle I*"].

[2] *In re Oracle Corp. Deriv. Litig.*, 2020 WL 3410745 (Del. Ch. June 22, 2020).

[3] The facts, except where otherwise noted, are drawn from the Verified Fifth Am. Deriv. Compl., Dkt. No. 484 [hereinafter "Compl."], and exhibits or documents incorporated therein, and are presumed true for the purposes of this Motion to Dismiss.

transaction; they allege that various officers and directors of Oracle breached their fiduciary duties to the Plaintiffs.

The Nominal Defendant, Oracle, is allegedly controlled by Defendant Lawrence J. Ellison. Ellison is Oracle's founder, former CEO, current Chairman and Chief Technology Officer, and current 37.8% stockholder.[4] The Plaintiff stockholders allege that Oracle fiduciaries, at Ellison's behest, faithlessly caused Oracle to purchase NetSuite at an inflated price. NetSuite, like Oracle, was founded and allegedly controlled by Ellison.[5] Prior to Oracle's acquisition of NetSuite, Ellison held 39.2% of NetSuite's common stock; that number jumps to 44.8% when combined with the holdings of his family members, affiliates, and related entities.[6]

The transaction was evaluated by a Special Committee, the independence of which is disputed by the parties.[7] In this Memorandum Opinion, I address the Motion to Dismiss by two officer-director Defendants—Paula Hurd, as trustee of the Hurd Family Trust (the successor of officer director Mark V. Hurd ("Hurd")) and Jeffrey O. Henley—and one outside director, Renée J. James.[8]

---

[4] Compl. ¶ 2.
[5] Compl. ¶¶ 2–3.
[6] Compl. ¶ 26.
[7] Compl. ¶ 115.
[8] *See* Opening Br. In Support of Renee J. James, Paula Hurd as Trustee of The Hurd Family Trust and Jeffrey O. Henley's Mot. to Dismiss, Dkt. No 485 [hereinafter "MTD OB"].

2

## II. ANALYSIS

The moving Defendants seek a dismissal under Rule 12(b)(6). In evaluating the motions, I must take as true all well-pled allegations and view the inferences therefrom in the light most favorable to the Plaintiffs.[9] Only where, nonetheless, I find it not reasonably conceivable—that is, not plausible—that the Plaintiffs may prevail, may I grant a motion to dismiss.[10]

Although the three Defendants are implicated in the same transaction, a determination of whether the Plaintiffs have adequately pled a claim against each of them must be, necessarily, done on an individual basis. That is particularly so here because Hurd and Henley were executives, while James was not; Hurd and Henley are therefore vulnerable to duty of care allegations if they were acting in their capacities as officers, rather than directors.[11]

To the extent the moving Defendants acted as directors, the Complaint, to be viable, must plead disloyalty.[12] The Supreme Court's opinion in *In re Cornerstone Therapeutics Inc., Stockholder Litigation* is controlling in that situation.[13] That opinion establishes that a plaintiff will survive a motion to dismiss "by pleading facts

---

[9] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011).
[10] *Id.*
[11] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1288 (Del. 1994) (noting that "where a defendant is a director and officer, only those actions taken solely in the defendant's capacity as an officer are outside the purview of Section 102(b)(7)").
[12] Oracle's charter provides exculpation for liability except for breaches of loyalty.
[13] 115 A.3d 1173 (Del. 2015).

supporting a rational inference that the director . . . acted to advance the self-interest of an interested party from whom they could not be presumed to act independently . . . ."[14]  As the Defendants and the Plaintiffs agree, *Cornerstone* requires the plaintiff to plead facts supporting a rational inference that the director defendant both:  (a) lacked independence from an interested party, and (b) "acted to advance" the self-interest of the same interested party.[15]  For Hurd and Henley, then, my analysis must first determine whether their challenged actions were taken in their capacities as officers or directors and, if those actions were taken as directors, then apply *Cornerstone*.  I address them each, individually, first, before finally turning to James, to whom only the *Cornerstone* analysis is applicable.  I note that, in addressing the facts alleged against each moving Defendant, I have attempted to include—for purposes of this pleading-stage motion—all allegations in the Fifth Amended Complaint that the Plaintiffs appear to think are relevant, although to my mind some are at most tangentially so.

*A. Mark V. Hurd*

1. Hurd's Background

Defendant Paula Hurd, as trustee of the Hurd Family Trust, is the legal successor to Mark V. Hurd.[16]  Hurd served as one of Oracle's co-CEO's from

---

[14] *Id.* 1179–80.
[15] MTD OB 23; Pls.' Opp'n to Mot. to Dismiss of Renee J. James, Paula Hurd as Trustee of The Hurd Family Trust and Jeffrey O. Henley 27, Dkt. No. 499 [hereinafter "MTD AB"].
[16] Compl. ¶ 28.

September 2014 until his passing in October 2019.[17] Prior to serving as Oracle's CEO, Hurd was Oracle's President, a position he held from September 2010 to September 2014. Ellison has described Hurd as his "close and irreplaceable friend, and trusted colleague."[18] Based on these and other facts, I previously found that Hurd was not independent of Ellison for demand futility purposes.[19]

### 2. Factual Allegations Regarding Hurd and the NetSuite Acquisition

Ellison first broached the prospect of Oracle acquiring NetSuite to Oracle co-CEO Sofra Catz on February 20, 2015.[20] Hurd was looped in not long after, on February 25, 2015, by which time a presentation book had been prepared for Ellison, Catz, and Hurd about a potential acquisition.[21]

### a. The Porcupine Creek Meeting

The proposal was not brought to the Board until almost a year later. During a January 14–15, 2016 Board meeting at Ellison's Porcupine Creek property,[22] Catz sent Ellison and Hurd a short slide deck about two code-named M&A opportunities, with two slides dedicated to NetSuite.[23] Hurd and Catz then led a strategy discussion

---

[17] Compl. ¶ 28.
[18] Compl. ¶ 28.
[19] *Oracle I*, at *16.
[20] Compl. ¶ 65. Catz is a Defendant in this action.
[21] Compl. ¶ 65.
[22] While "Porcupine Creek" may sound like the remote ranch of some leftover prospector, it is in fact a private-mansion-and-golf-course complex at Rancho Mirage, California, south of Palm Springs.
[23] Compl. ¶ 83.

5

with the Board, while Oracle's Chief of Staff, Douglas Kehring, provided the Board with a verbal overview of a potential acquisition of NetSuite.[24] At that meeting, which all thirteen then-directors attended,[25] the Board purportedly voted[26] to "direct[] management to continue to assess the feasibility of pursuing" an acquisition of NetSuite.[27] The Board also directed Catz and Hurd to contact NetSuite "to understand if NetSuite would be willing to receive an indication of interest" but prohibited them from "engag[ing] in any price discussions or otherwise engag[ing] with NetSuite's management."[28]

*b. Hurd's Involvement pre-Special Committee and Recusal*

After receiving this direction, Catz and NetSuite's CEO discussed a potential acquisition over dinner, including (despite the Oracle board's instructions to the contrary) potential prices Oracle would be willing to pay and NetSuite would be willing to accept.[29] Hurd did not participate in these discussions.[30] However, a senior executive of NetSuite recounted that his impression of a January 27, 2016 call with Ellison was that "[t]here was a commitment at the highest level of Oracle –

---

[24] Compl. ¶ 84.
[25] Compl. ¶ 82.
[26] A vote is not mentioned in the Complaint but is raised by the Plaintiffs in their Answering Brief. MTD AB 36.
[27] Compl. ¶ 85(f).
[28] Compl. ¶ 85(f).
[29] Compl. ¶¶ 87–92.
[30] *See* Compl. ¶¶ 87–92.

Mark Hurd, Safra Catz and Larry Ellison – to maintain the integrity of the NetSuite organization."[31]

In March 2016, Hurd was presented[32] with an analysis of the competition between NetSuite and Oracle.[33] He and Catz were both involved in planning which directors would sit on the Special Committee.[34] On March 11, 2016, per the Complaint, someone told Defendant Henley that he, Hurd, and Catz would need to recuse themselves at some point from a Board meeting slated for March 18 (the "March 2016 Board Meeting").[35] Neither Henley nor Hurd attended that meeting.[36]

### c. Hurd's Involvement After the Special Committee is Formed

On May 31, Hurd was told that "Oracle officers and employees will not participate in the process of evaluating and negotiating a potential transaction with [NetSuite] without authorization of the Special Committee or its members or advisors."[37] On July 25, 2016, after NetSuite and Oracle had agreed to a price of $109 per share, Hurd was invited to attend a call with NetSuite executives, a dinner with other senior executives of NetSuite, an internal bringdown meeting with Catz, and a final presentation to the Special Committee.[38] He responded, "It's all on my

---

[31] Compl. ¶ 101.
[32] Use of the passive voice throughout follows the language of the Fifth Amended Complaint.
[33] Compl. ¶ 113.
[34] Compl. ¶ 115.
[35] Compl. ¶ 115.
[36] Compl. ¶ 116.
[37] Compl. ¶ 127.
[38] Compl. ¶ 163.

calendar."[39] Hurd was deeply involved in Oracle's budgeting process and was aware of NetSuite's operating models while the deal was pending.[40] He and Catz presided over a diligence bringdown meeting.[41] On July 27, 2016, the Special Committee met to approve the tender offer—that meeting was attended by "Catz and management."[42] But the complaint does not specifically allege that Hurd attended the meeting or was in any way involved.[43]

### d. Hurd's Involvement After the Acquisition is Announced

On July 28, 2016, Oracle announced that it would acquire NetSuite for $109/share.[44] In that announcement, Hurd stated that "Oracle and NetSuite cloud applications are complementary, and *will coexist in the marketplace forever*."[45] In Oracle's Q2 2019 earnings call, Hurd stated that the "core tenets" of Oracle's management when "we bought NetSuite" included increasing Sales & Marketing and increasing Research and Development.[46] That information was contrary to a model presented by Catz to the Special Committee at a July 13, 2016 meeting.[47] The

---

[39] Compl. ¶ 163.
[40] Compl. ¶ 164.
[41] Compl. ¶ 164.
[42] Compl. ¶ 165.
[43] *See* Compl. ¶ 165.
[44] Compl. ¶ 174.
[45] Compl. ¶ 175 (emphasis added). *See* Percy Bysshe Shelley, <u>Ozymandias</u> (1818) ("Look on my Works, ye Mighty, and despair!").
[46] Compl. ¶ 213.
[47] Compl. ¶ 213.

Complaint does not indicate that Hurd attended that meeting.[48] On November 4, 2016, Catz and Hurd were given an integration update for NetSuite that further conflicted with Catz's model.[49]

### 3. Analysis: It is not reasonably conceivable that Hurd acted with gross negligence or disloyalty or in furtherance of Ellison's self-interest.

I had previously found that Hurd was not sufficiently independent for a Rule 23.1 analysis because he was employed by a company with a very influential stockholder-defendant;[50] he is similarly conflicted for purposes of a Rule 12(b)(6) motion to dismiss. This litigation was first filed on May 3, 2017.[51] The complained-of transaction was announced less than a year prior—on July 27, 2016.[52] The considerations of whether Hurd was independent on May 3, 2017 were equally applicable during the course of the negotiation of the NetSuite transaction.

The Plaintiffs' allegations regarding Hurd's actions can be summarized thusly: (1) "[h]e received the direction from the Board to reach out to NetSuite" at the Porcupine Creek meeting; (2) a NetSuite executive remembered that Hurd, Catz, and Ellison were "committed" to maintaining the integrity of NetSuite's organization; (3) Hurd was invited to the final review of information about NetSuite with the Special Committee before the Special Committee approved the acquisition;

---

[48] Compl. ¶¶ 157–159.
[49] Compl. ¶ 210.
[50] *Oracle I*, at *16.
[51] Verified Stockholder Deriv. Compl. For Breach of Fiduciary Duty, Dkt. No. 1.
[52] Compl. ¶ 165.

9

(4) after the Special Committee approved the transaction, Hurd made statements that contradicted information previously presented to the Special Committee by Catz; and (5) Hurd described Oracle and NetSuite's products as complementary, even though Oracle and NetSuite were competitors.[53]

In order for the Plaintiffs to pursue a duty of care claim against Hurd, they must show that his actions were undertaken as an officer.[54] On this, in my view, the Plaintiffs prevail. The Board instructed Hurd, with Catz, to approach NetSuite. Further, a NetSuite executive indicated that he believed Hurd, along with Ellison and Catz, was committed to retaining NetSuite's organization. These two factual allegations indicate, to me, that Hurd was operating as an officer rather than a director. Accordingly, his actions must be reviewed not only for disloyalty but also for gross negligence. Gross negligence is itself a high bar; it requires conduct exhibiting a deliberate indifference to the interests of the company.[55]

As alleged, these facts do not support such an inference. The receipt of directions does not mean that Hurd followed them, disloyally or with deliberate indifference with respect to Oracle; indeed, while the Complaint is replete with descriptions of *Catz's* actions in negotiating with NetSuite's management,

---

[53] MTD AB 36–37.
[54] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1288 (Del. 1994).
[55] *Albert v. Alex Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005) ("Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one which involves a devil-may-care attitude or indifference to duty amounting to recklessness." (internal quotation marks omitted)).

10

allegations as to Hurd are conspicuously absent.[56] The sole mention of his role in negotiations, if any, is a NetSuite executive's recollection that there was commitment at the highest level from Oracle—Ellison, Catz, and Hurd—that NetSuite's organization would be left intact. These allegations are insufficient to reasonably imply grossly negligent or disloyal action by Hurd.

Hurd, the Plaintiffs note, was also "invited" to a final presentation to the Special Committee—an invitation he responded was "on [his] calendar."[57] This fact, however, does not make it reasonably conceivable that Hurd *participated* in the final review or took any action besides attending as a passive observer. Indeed, that Hurd was given an invitation, instead of being a meeting organizer, implies that his role was, at most, secondary.[58] I conclude that this allegation does not permit reasonable conceivability of Hurd's gross negligence or lack of loyalty.

Finally, the Plaintiffs note that Hurd made several statements after Oracle approved the transaction that either (a) conflicted with information provided by Catz to the Special Committee or (b) were contrary to the fact that Oracle and NetSuite were competitors—a fact that Hurd allegedly knew and withheld.[59] The Plaintiffs

---

[56] In *Oracle I*, I remarked upon "the paucity of specific allegations about Henley and Hurd's role in the transaction process[.]" *Oracle I*, at *22. That comment remains pertinent even in light of the Fifth Amended Complaint.

[57] Compl. ¶ 163.

[58] This is, in my view, the most favorable reasonable inference I can draw for the Plaintiffs; the alternative, less friendly inference is that Hurd needed reminding to attend a meeting that he did not have any role in planning or preparing.

[59] *See* Compl. ¶¶ 212–14; 175.

11

posit that these statements indicate that Hurd was in possession of material information prior to the Special Committee's approval of the acquisition and then purposely withheld that information, in breach of his fiduciary duties.[60]

This is a serious charge. As an officer or a director of Oracle, Hurd owes fiduciary duties that require him not to withhold information that would have been material to the Board or Special Committee's decision-making.[61] If the Plaintiffs could allege that Hurd was aware that the Special Committee lacked material information that he possessed (or that he was grossly negligent in not being so aware) and that he failed to communicate such information to the Committee, they would have stated a claim against Hurd. The factual allegations here, however, fall short.

First, *Catz*, not Hurd, is alleged to have presented misleading information to the Special Committee at a July 13, 2016 meeting.[62] Indeed, the Complaint does not indicate that Hurd even attended that meeting;[63] and, given that Hurd was instructed not to "participate in the process of evaluating and negotiating a potential transaction with"[64] NetSuite, it is unclear to me how Hurd would have known what information was presented to the Special Committee at that meeting. Hurd did, however,

---

[60] MTD AB 37.

[61] *In re Columbia Pipeline Grp., Inc.*, 2021 WL 772562, at *51 (Del. Ch. Mar. 1, 2021), *cert. denied sub nom. In re Columbia Pipeline Grp. Inc.* (Del. Ch. 2021), and *appeal refused sub nom. In re Columbia Pipeline Grp., Inc. Merger Litig.*, 249 A.3d 801 (Del. 2021).

[62] Compl. ¶¶ 207–212.

[63] *See* Compl. ¶¶ 207–212.

[64] Compl. ¶ 127.

"preside[] over a" NetSuite diligence bringdown meeting.[65]   The Plaintiffs conclusorily allege that Hurd knew the numbers presented at that meeting were unrealistic and inflated; but the Complaint gives no indication as to what numbers were presented, and how Hurd knew they were inflated.

The Plaintiffs allege that Hurd was "deeply involved in Oracle's budgeting process and was aware of the NetSuite operating models while the deal was pending"[66]—a conclusory statement as to Hurd's knowledge that, even if true, would not establish that Hurd knew that such information was withheld from the Special Committee.  On November 4—*i.e.*, after the acquisition had been announced—Hurd received materials that conflicted with information that Catz had given to the Special Committee.[67]   But, again, that does not indicate that Hurd knew (or was grossly negligent in not knowing) what information Catz had given the Special Committee or that such information was false.  Finally, the Plaintiffs impute Hurd's knowledge through a statement he provided at Oracle's Q2 2019 earnings call—a call that occurred over two years after the tender offer was approved—that was "contrary to Catz's [July 2016] model."[68]  All told, the Plaintiffs have failed to provide any non-conclusory factual allegations that Hurd knew material information that,

---

[65] Compl. ¶ 164.
[66] Compl. ¶ 164.
[67] Compl. ¶ 210.
[68] Compl. ¶ 213.

13

importantly, *he also knew the Special Committee did not have*. Nor is it reasonably conceivable that Hurd, who (according to the Plaintiffs) was told to take no role in the negotiation *or evaluation* of a NetSuite deal, was grossly negligent in failing to inform the Board of any information he possessed regarding NetSuite.

The Plaintiffs point out that Hurd did know that Oracle and NetSuite were competitors[69] and yet made statements that their businesses were complementary.[70] To the extent the Plaintiffs suggest that the latter statement must be knowingly false or reckless, I am unable to follow that logic. Simply because products compete when they belong to separate entities does not mean they cannot complement if they belong to the same entity. Those statements, in any event, were not made to the Board or the Special Committee but were made to the public *after* the acquisition was announced.[71] Because Oracle was engaging in a tender offer for NetSuite shares, Oracle stockholders did not vote on the transaction; there was, accordingly, no stockholder vote to influence. These statements do not breach a fiduciary duty regarding this transaction. Nor do they indicate that Hurd withheld the fact of Oracle's competition with NetSuite from the Special Committee—as I explain more

---

[69] Compl. ¶ 113.
[70] Compl. ¶ 175, 205.
[71] Compl. ¶ 175 (occurring with the announcement of the acquisition); Compl. ¶ 205 (occurring upon closing of the tender offer).

in discussing Defendant Henley, below, I do not find it reasonably conceivable that the Special Committee was unaware that Oracle and NetSuite were competitors.[72]

In sum, the Plaintiffs have failed to allege facts sufficient to make it reasonably conceivable that Hurd acted either with gross negligence or disloyally in furtherance of Ellison's self-interest. Hurd's Motion to Dismiss is granted.

### B. Jeffrey O. Henley

#### 1. Henley's Background

Defendant Jeffrey O. Henley is Oracle's Executive Vice Chairman of the Board and has held that position since September 2014.[73] He was previously Oracle's Chairman of the Board and held that position for ten years.[74] Henley has been described as "one of Ellison's most trusted lieutenants."[75] In *Oracle I*, I found that Henley, as an employee of Oracle, could not independently consider a demand.[76]

#### 2. Factual Allegations Regarding Henley and the NetSuite Acquisition

##### a. The Porcupine Creek Meeting

Henley, like Hurd, attended the January 14–15, 2016 Porcupine Creek Board meeting, at which management presented the full Board with a proposal to reach out to NetSuite and begin acquisition discussions.[77] During that meeting, the Board,

---

[72] *See* Section II.B.3.c. *infra*.
[73] Compl. ¶ 29.
[74] Compl. ¶ 29.
[75] Compl. ¶ 29.
[76] *Oracle I*, at *16.
[77] Compl. ¶ 82.

15

including Henley, purportedly voted[78] to "direct[] management to continue to assess the feasibility of pursuing" a purchase of NetSuite.[79]

### b. Knowledge of Competition with NetSuite and Recusal

The Complaint also discusses at length Henley's efforts, as an Oracle employee,[80] to "crush"[81] NetSuite as Oracle's competitor[82] and implies that Henley had specialized knowledge about the true state of the competition between NetSuite and Oracle.[83] The Plaintiffs charge Henley with fraud on the board,[84] alleging that he withheld his particular knowledge from the Board and Special Committee, "chose to absent himself" from the March 2016 Board Meeting,[85] and chose to "not make sure that the Special Committee was informed about the true state of competition between Oracle and NetSuite."[86] The Complaint also avers that Henley was told that his attendance at the March 2016 Board Meeting was not mandatory and that he would need to recuse "at some point during the meeting."[87]

---

[78] *See* note 26 *supra*.
[79] Compl. ¶ 85(f).
[80] That Henley is an officer is not clear from the "Parties" section of the Complaint. Compl. ¶ 29. However, the Complaint refers to Henley as an officer, Compl. ¶ 35, and the Defendants do not dispute this characterization in their Opening Brief. *See* MTD OB 30.
[81] Compl. ¶ 64.
[82] *E.g.*, Compl. ¶¶ 64, 109, 112, 113, 115.
[83] Compl. ¶ 229; *see* Compl. ¶¶ 120–124, 175, 184, 205 (discussing the efforts of non-Henley officers).
[84] MTD AB 36. The Plaintiffs purport to support this charge through a number of cites to the Complaint (notably, paragraphs 7, 120, 121, 124, 175, 184, and 205). However, none of those cites implicate *Henley*—rather, they implicate other members of management.
[85] Compl. ¶ 116.
[86] Compl. ¶ 229.
[87] Compl. ¶ 115.

3. <u>Analysis: It is not reasonably conceivable that Henley acted in furtherance of Ellison's self-interest.</u>

*a. Henley acted as a director, not an officer.*

Like Hurd, Henley is both a director and an officer. Unlike Hurd's, however, Henley's actions can be squarely characterized as those taken by a director; his alleged breaches are that he (i) participated in the Porcupine Creek meeting and voted in favor of considering a NetSuite acquisition, and (ii) possessed material information that he did not share with the Special Committee. Neither of those actions can be reasonably characterized as "taken solely in [Henley's] capacity as an officer" and, accordingly, I find that Henley acted as a director.[88]

To determine whether the Plaintiffs have stated a claim for a breach of Henley's duty of loyalty, then, I turn to *Cornerstone*'s two-prong test: whether Henley both (a) lacked independence from an interested party, and (b) "acted to advance" the self-interest of the same interested party.[89] Like Hurd, I had previously found that Henley was not sufficiently independent for a Rule 23.1 analysis;[90] for the same reasons applicable to Hurd, Henley is also conflicted for purposes of a Rule 12(b)(6) motion to dismiss. Per *Cornerstone*, then, I turn to Henley's actions in

---

[88] *Morrison v. Berry*, 2019 WL 7369431, at *25 n.307 (quoting *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1288 (Del. 1994)).
[89] *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1180 (Del. 2015).
[90] *Oracle I*, at *16.

17

connection with the NetSuite acquisition and consider whether they were taken to advance Ellison's self-interest.

> *b. Henley's Porcupine Creek vote was not an act to advance Ellison's self-interest.*

Henley's sole challenged affirmative action[91] in furtherance of the NetSuite acquisition was his vote at the Porcupine Creek Board meeting. That Board meeting, which took place on January 14–15, 2016, at the Porcupine Creek estate, was attended by all thirteen then-directors of Oracle.[92] At that meeting, Catz and Hurd led a strategy discussion with the Board, during which Oracle's Chief of Staff provided the Board with a verbal overview of a potential NetSuite acquisition.[93] Henley, along with the other thirteen directors, voted to "direct[] management to continue to assess the feasibility of pursuing" a potential acquisition of NetSuite.[94]

Henley's vote is the only affirmative act that the Plaintiffs challenge. That vote, in my view, is insufficient to show that Henley acted in Ellison's interest and against the interests of the common stockholders. The Porcupine Creek meeting was the first time the Board had heard of a potential NetSuite deal. The vote held was not to approve the deal nor was it to create a Special Committee. Rather, the meeting and vote were merely to decide whether Oracle would even entertain the idea of a

---

[91] The Plaintiffs' allegation of withheld information is, in my view, not an affirmative act but rather a passive one, and will be addressed below.
[92] Compl. ¶ 82.
[93] Compl. ¶ 84.
[94] Compl. ¶ 85(f).

NetSuite acquisition. Consideration of whether to formulate a NetSuite deal does not harm Oracle—the consummation of such a deal at an exorbitant price does. The connection between a vote to consider acquiring NetSuite and the actual harm alleged—the consummation of a self-dealing transaction that extracted value for Ellison to the detriment of the other stockholders—is too attenuated, in my view, to provide a rational inference that Henley's vote was an action in furtherance of Ellison's self-interest to the detriment of the other stockholders.

> *c. It is not reasonably conceivable that Henley withheld material information from the Board or Special Committee that he knew the Board or Special Committee did not have.*

The Plaintiffs also allege that "Henley was intimately familiar with NetSuite's competitive weakness through his personal efforts to 'crush' NetSuite" and that he withheld that information from the Board and the Special Committee.[95] That inaction, in my view, does not relate solely to Henley's officer capacity. I note that the Complaint does not even mention, in the "Parties" section, what Henley's executive position is.[96] There is no allegation that the Special Committee sought his input as an officer. Nor was knowledge of the status of Oracle's competition with NetSuite exclusive to officers.[97] In my view, Henley's actions are as readily ascribed

---

[95] Compl. ¶ 229; MTD AB 35.
[96] Compl. ¶ 29.
[97] *See* Compl. ¶ 66 ("On April 29, 2015, the Board's Committee on Independence Issues, consisting of outside directors H. Raymond Bingham, Hector Garcia-Molina, and Jeffrey S. Berg, held a regular meeting. The first item on the agenda was the status of competition with NetSuite.").

to his director role as to his position as officer, and Oracle's exculpatory clause applies.

Further, it does not seem reasonably conceivable to me that the directors of the Special Committee could have been unaware that NetSuite was a competitor, nor do the Plaintiffs so argue; rather, the Plaintiffs' argument appears to be that Henley had *special or particular* knowledge beyond what the directors were aware of. [98] Even so, I do not find it reasonably conceivable that Henley, if he did possess such special knowledge, acted disloyally by failing to ensure the Special Committee knew those details. [99] That is because the Plaintiffs have not alleged that Henley knew that the Special Committee directors were unaware of those details. [100] It is not reasonably conceivable, to me, that Henley possessed material and specialized knowledge about NetSuite's competition with Oracle that he knew was not available to the Special Committee. I note that the entirety of what the Plaintiffs *have* alleged concerning Henley—that he had special knowledge regarding NetSuite and that the

I note that the Plaintiffs contend that none of the Committee on Independence Issues directors sat on the Special Committee. Compl. ¶118.

[98] *See* MTD AB 35–36 ("Henley's defense is that the true state of competition between Oracle and NetSuite was not a secret to which Henley had special access. . . . But Henley possessed information about the state of competition between Oracle and NetSuite that was not disclosed to the Board at Porcupine Creek or subsequently disclosed to the Special Committee.").

[99] Indeed, if I were to conclude otherwise, then the same would apply to the members of the Committee of Independent Issues, who, according to the Complaint, also were more well-acquainted with the status of Oracle's competition with NetSuite than the Special Committee directors. Compl. ¶ 118.

[100] In contradictory fashion, the Complaint also asserts that the chairperson of the Special Committee—James—was well aware of the "massive leverage Oracle had due to its ability to outcompete NetSuite." Compl. ¶ 124.

Special Committee lacked it[101]—is purely conclusory. Accordingly, I do not find it reasonably conceivable that Henley's "failure" to affirmatively act to inform the Board or Special Committee was an action taken to further Ellison's self-interest.[102] Henley's Motion to Dismiss is granted.

## C. Renée J. James

### 1. James' Background

Defendant Renée J. James is a director of Oracle and chaired the Special Committee.[103] She is a "close friend" of Catz, who is one of Oracle's two CEO's and the "enforcer, gatekeeper, and de facto operating chief for [Ellison]."[104] James had left her previous job and intended to become a Silicon Valley CEO—the Plaintiffs point to her career ambitions as a conflict that would cause her to prioritize Ellison's interests, given his outsized role in the industry.[105] James launched a startup chip company in 2017 with financial backing from Oracle in the amount of $46 million; she had been working on the startup since before joining the Oracle Board.[106] Oracle invested another $40 million in that startup chip company in April

---

[101] Compl. ¶ 66. The Complaint's assertion that the Special Committee directors were not acquainted with the status of Oracle's competition with NetSuite simply because they did not sit on the Committee on Independence Issues meetings in 2015, in my view, does not follow from the fact alleged.

[102] Compl. ¶ 115.

[103] Compl. ¶ 30.

[104] Compl. ¶¶ 27, 30.

[105] Compl. ¶ 30.

[106] Compl. ¶ 30.

of 2019.[107] These facts, and others, led me to find in *Oracle I* that James could not independently bring her business judgment to bear in deciding whether to sue Ellison.[108]

2. Factual Allegations Regarding James and the NetSuite Acquisition

Like Hurd and Henley, James attended the Porcupine Creek Board meeting in January 2016, when she ostensibly voted to direct Catz and Hurd to determine whether NetSuite would be open to a potential acquisition.[109] In March, James was appointed to the three-member Special Committee[110] and that Committee subsequently appointed her the chair.[111] As chair of the Special Committee, James was actively involved in Oracle's consideration of a potential NetSuite deal. In a May 13, 2016 Special Committee meeting, she reported on a full-day diligence meeting with NetSuite—at which she was the only member of the Special Committee present.[112] The Special Committee allowed Catz, despite her ties to Ellison, to lead the acquisition discussion with NetSuite until May 26.[113] The Complaint alleges that James was aware of Oracle's competition with NetSuite and "understood the massive leverage Oracle had due to its ability to outcompete

---

[107] Compl. ¶ 30.
[108] *Oracle I*, at *18.
[109] Compl. ¶¶ 82, 85(f).
[110] Compl. ¶ 118.
[111] Compl. ¶ 123.
[112] Compl. ¶ 124.
[113] Compl. ¶ 126.

NetSuite."[114]   Nevertheless, James, at Special Committee meetings, "noted the potentially complementary nature of the two companies and their respective addressable markets."[115]   The implication, per the Plaintiffs, is that James disloyally permitted Oracle to overpay for NetSuite, to Ellison's benefit.

### 3. It is reasonably conceivable that James acted in furtherance of Ellison's self-interest.

James is not an officer, and so I apply *Cornerstone*'s two-prong test:  whether James both (a) lacked independence from an interested party, and (b) "acted to advance" the self-interest of the same interested party.[116]  As with Henley and Hurd, I found in *Oracle I* that James lacked independence under Rule 23.1.  I conclude based on the same allegations that she is not independent of Ellison for purposes of this Motion to Dismiss under Rule 12(b)(6).  The second prong of the *Cornerstone* test—actions to advance Ellison's self-interest—is also easily satisfied at this pleading stage, with its plaintiff-friendly inferences.  James was the chairperson of the Special Committee and, as demonstrated by her attendance at a diligence meeting with NetSuite without the other two directors of the Special Committee, took an active role in the negotiations.  It is reasonably conceivable that James, who both is not independent of Ellison and who actively participated in the formulation of the

---

[114] Compl. ¶ 124.
[115] Compl. ¶ 124.
[116] *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1180 (Del. 2015).

NetSuite acquisition, acted to advance Ellison's self-interest in securing the deal. James' Motion to Dismiss must, therefore, be denied.

## III. CONCLUSION

For the foregoing reasons, the Motion to Dismiss is granted as to Hurd and Henley and denied as to James. The parties should submit an appropriate form of order.